GURDON W. WATTLES, APPELLEE, v. SOUTH OMAHA ICE & COAL COMPANY, APPELLANT.

FILED JANUARY 7, 1897. No. 8810.

1. **Landlord and Tenant: REPAIRS.** An express agreement of a lessee to keep in good repair leased premises, and at the end of the expiration of the term surrender their possession in as good condition as they were when he entered, natural decay, wear and tear ex-

cepted, is not, and does not include, a covenant to rebuild build-ings destroyed without his fault.

2. ———: ———. If such was the common law rule of construction of such a covenant, it is not in force in this state.

3. ———: ———: RENT. Where a substantial portion of leased prem-ises is destroyed without the fault of the lessee, he is entitled to an apportionment of the rent covenanted to be paid and accruing thereafter, in the absence of an express assumption by him of the risk of such destruction.

4. ———:. ———: ———. The common law rule of construction of such a covenant is not in force in this state.

APPEAL from the district court of Douglas county. Heard below before KEYSOR, J. *Reversed.*

The facts are stated by the commissioner.

*Charles Offutt,* for appellant:

Appellant is not required to reconstruct the buildings destroyed by the hurricane August 22, 1896. (Taylor, Landlord & Tenant [7th ed.], sec. 358; *Whitaker v. Hawley,* 25 Kan., 692; *Pollard v. Shaaffer,* 1 Dal. [Pa.], 210; 12 Am. & Eng. Ency. Law, 721; *Warner v. Hitchins,* 5 Barb. [N. Y.], 666; *Levey v. Dyess,* 51 Miss., 501; *Miller v. Morris,* 55 Tex., 412; *Wainscott v. Silvers,* 13 Ind., 500; *Warren v. Wagner,* 75 Ala., 188; *Maggort v. Hansbarger,* 8 Leigh [Va.], 536; *Lister v. Lane,* L. R., 2 Q. B. Div. [Eng.], 212; *Howelh v. Anderson,* 25 Tex., 557; *Nave v. Berry,* 22 Ala., 382; *Halloway v. Lacy,* 4 Humph. [Tenn.], 468.)

Appellee Wattles is compelled to reconstruct the build-ings as a condition precedent to his right to collect all the rent stipulated in the lease after August 22, 1896. (*Brooks v. Hiatt,* 13 Neb., 503; *Lanning v. Burns,* 36 Neb., 236; *Whitaker v. Hawley,* 25 Kan., 687.)

In the event of appellee's failure to rebuild after rea-sonable demand, appellant can require an apportionment of the rent from the date the buildings were destroyed to the expiration of the lease. (Taylor, Landlord & Ten-ant [7th ed.], sec. 520; *Whitaker v. Hawley,* 25 Kan., 692; *Pollard v. Shaaffer,* 1 Dal. [Pa.], 215; *Ripley v. Wightman,*

4 McCord [S. Car.], 447; *Coogan v. Parker*, 2 S. Car., 255; *Doe v. Burt*, 1 Term R. [Eng.], 701; *Richard Le Tavenor's Case*, 1 Dyer [Eng.], 56a; *Brown v. Quilter*, Amb. [Eng.], 619; *Cutter v. Powell*, 6 Term R. [Eng.], 320.)

*James H. Macomber, contra:*

Appellant is bound to repair the buildings before the termination of the term of the lease. (12 Am. & Eng. Ency. Law, 721; *Polack v. Pioche*, 35 Cal., 416, 95 Am. Dec., 121, and note; *Blount v. City of Janesville*, 31 Wis., 654; *Columbus v. Watson*, 26 Ind., 52; *Fisher v. Milliken*, 8 Pa. St., 111; *Workman v. Mifflin*, 30 Pa. St., 369; *United States v. Bostwick*, 94 U. S., 53; 1 Wood, Landlord & Tenant, sec. 373; 1 Taylor, Landlord & Tenant, sec. 357; 1 Washburn, Real Property [4th ed.], 535; 2 Kerr, Real Property, secs. 1232, 1233; *Kling v. Dress*, 5 Robt. [N. Y.], 521; *Stults v. Locke*, 47 Md., 562; *Gluck v. Mayor of Baltimore*, 81 Md., 315.)

The rent stipulated in the lease must be paid as if the buildings had remained intact. (*Minneapolis Co-Operative Co. v. Williamson*, 38 Am. St. Rep. [Minn.], 482; *Fowler v. Payne*, 49 Miss., 32; *Harrington v. Watson*, 11 Ore., 143; *Womack v. McQuarry*, 28 Ind., 103; *Chamberlain v. Godfrey*, 50 Ala., 533; *Buerger v. Boyd*, 25 Ark., 441; *Harris v. Heackman*, 62 Ia., 411, 12 Am. & Eng. Ency. Law, 741, and cases cited; *Stubbings v. Evanston*, 136 Ill., 37; *Parks v. City of Boston*, 15 Pick. [Mass.], 198; *Foot v. City of Cincinnati*, 11 O., 408; *Turner v. Townsend*, 42 Neb., 376; *Smith v. Kerr*, 108 N. Y., 31; *Salisbury v. Shirley*, 66 Cal., 223; *Lodge v. White*, 30 O. St., 569; *Hicks v. Martin*, 25 Mo. App., 359; *McMillan v. Solomon*, 42 Ala., 356; *Chamberlain v. Godfrey*, 50 Ala., 530; *Kerr v. Merchants Exchange*, 3 Edw. Ch. [N. Y.], 315; *Winton v. Cornish*, 5 O., 477; *Beham v. Ghio*, 75 Tex., 87; *Hilliard v. Gas Coal Co.*, 41 O. St., 662; *Graves v. Berdan*, 26 N. Y., 498; *Stockwell v. Hunter*, 11 Met. [Mass.], 448; *Smith v. McLean*, 123 Ill., 210; *Whitaker v. Hawley*, 25 Kan., 674.)

RAGAN, C.

On the 1st day of November, 1894, Gurdon W. Wattles and F. L. Cotton entered into an agreement in writing in and by which Wattles leased to Cotton for five years from said date the east one-half of the southwest quarter of the northwest quarter of section 1, township 15 north and range thirteen (13) west of the 6th P. M., "together with the buildings situated thereon." A rent of $6,000 was reserved, payable in 60 installments of $100 each. The first installment was paid at the date of the execution of the lease and one installment fell due on the first day of each month thereafter. In the lease, Cotton covenanted as follows: "That at the expiration of the term above granted * * * he will quietly and peaceably yield up possession of said premises * * * in as good condition as the same were when entered upon, ordinary wear or damage by fire excepted. * * * It is understood and agreed that the buildings on the above described property have been placed in good repair by [the lessor] and shall be kept in the same condition by [the lessee] during the term of this lease, natural decay and wear and tear excepted." Cotton assigned his interest in this lease to the South Omaha Ice & Coal Company, hereinafter called lessee, which took possession of the leased premises and began using the same for the purposes for which they were leased; that is to say, for harvesting ice formed on the waters on said leased lands and storing such ice in the buildings thereon. The rent reserved was paid up to the 1st day of September, 1896. On the 22d day of August of said year the buildings on the leased premises "were destroyed and rendered entirely valueless by a violent wind storm or hurricane." Notwithstanding the destruction of the ice houses, the lessor claimed that he was entitled to collect the rent reserved in the lease accruing subsequent to the destruction of the buildings; that he was under no obligation to rebuild the destroyed ice houses, but that the lessee was bound to re-

build the same. The lessee denied that he was bound to rebuild the destroyed ice houses and insisted that he was entitled to an apportionment of the rent reserved until such time as the lessor should rebuild the houses destroyed. The parties made up an agreed case under the provisions of sections 567, 568, 569 of the Code of Civil Procedure and submitted it to the district court of Douglas county. The parties filed in the agreed case in the district court a stipulation of the facts. This stipulation recited the execution of the lease between Wattles and Cotton; the assignment of his interest in the lease by Cotton to the South Omaha Ice & Coal Company; the covenants in the lease already mentioned; the taking possession of the leased premises by the lessee; the payment of the rent to September, 1896, and the destruction of the ice houses by a hurricane. The stipulation further recited that the premises had been leased for the sole and exclusive purposes of gathering ice formed on the waters on said lands and storing such ice in the buildings situate thereon; that 15 acres of the demised land were covered with water from which in the winter ice was gathered for storage; that the destroyed buildings were 6 in number, built together, each 100 feet long and 20 feet in width, and had a storage capacity for ice of from 8,000 to 10,000 tons; that there were no other buildings or improvements of any kind on the leased premises at the time they were leased or since; that the fair rental value of the entire premises was $1,200 per year, and that the fair rental value of the premises since the destruction of the ice houses, or without them, was $600 per year. The district court was of opinion that the agreements and promises made in the lease by the lessee amounted to a covenant on his part to rebuild the destroyed ice houses and that he was liable for all the rent reserved in the lease and entered a decree accordingly. The lessee has appealed.

This case should be treated in all respects as though it was an ordinary action at law by the lessor to recover

the rent reserved in the lease and that the lessee had interposed as a defense the destruction, without his fault or the fault of the lessor, of a substantial part of the leased premises, and invoked in his answer, by way of a cross-petition, the equitable power of the court for an apportionment of the rent.

1. The lessee covenanted to keep in repair the leased premises and at the expiration of the term surrender them in as good condition as they were when he entered, ordinary wear and tear and natural decay excepted. Does this covenant include a promise by the lessee to restore the buildings destroyed without his fault? That it does is the first argument urged in support of the decree. It is insisted that such was the rule of construction applied to such a covenant at common law.

The earliest American case which we have been able to find, which supports the contention under consideration, is *Phillips v. Stevens*, 16 Mass., 237, decided in 1819. The lessee covenanted that he "would keep in repair, support and maintain all and singular the fences and buildings, saving and excepting the natural decay of the same, as should be needful, at his own proper cost and charge; and at the end of said term  *  *  *  would quietly leave, surrender, and yield up the premises in as good condition as the same were in" at the date of his lease. The buildings on the leased premises were destroyed by fire without the fault of the lessee, and the supreme court of Massachusetts, in construing the covenant in the lease, held it to be a contract binding the lessee to rebuild the burned buildings.

In *Beach v. Crain*, 2 N. Y., 87, the lease provided that the lessor should, at his own cost, erect a gate at the terminus of a road on the leased premises and keep the gate there during his pleasure, and that all repairs necessary to be made to said gate were to be made by the lessee. Some person unknown, but without the fault of the lessee, removed the gate, and the court of appeals of New York held that the covenant of the lessee to repair

the gate included a contract on his part to replace it with
a new one.

In *Polack v. Pioche*, 35 Cal., 416, it seems that the lease
contained the usual covenant of the lessee to repair and
keep in repair the demised premises. The buildings on
the leased land were destroyed by the breaking of the
embankment of a reservoir, and this was caused by the
act of someone, but not by any fault of the lessee. The
court held that the covenant of the lessee to repair bound
him to restore or rebuild the destroyed buildings; and
the court declared that such had been the settled rule of
construction of such a covenant since the time of Edward
III.

In *Ely v. Ely*, 80 Ill., 532, the lessee covenanted that he
had received the leased premises in good order and con-
dition, and that he would keep them in repair at his own
expense, and that at the end of the term he would deliver
the same up to his lessor in as good order and condition
as when they were entered upon. The buildings upon
the leased premises were wholly destroyed by fire with-
out the fault of the lessee, and the supreme court of Illi-
nois held that the legal effect of the covenant of the lessee
to keep the demised buildings in repair, etc., was that in
case the buildings burned he would rebuild the same.

In *David v. Ryan*, 47 Ia., 642, the lessee covenanted that
she would keep the leased premises in a good state of
repair. They were destroyed by fire and the court held
that the covenant of the lessee bound her to restore the
buildings.

In 1 Taylor, Landlord & Tenant [8th ed.], sec. 357, the
rule is stated as follows: "When a tenant is under an
express covenant to repair the premises, he is liable to
make good all loss and damage which they may sustain,
and must even rebuild in case of casualty by fire or other-
wise."

In 12 Am. & Eng. Ency. of Law, p. 721, the authorities
in support of the rule under consideration are collated
and the rule is thus stated: "The alteration in the ten-

ant's liability for repairs, produced by his executing a
lease in which he makes an express covenant to repair,
is so marked that he becomes liable to make good all
loss and damage the premises may sustain, and must
even rebuild in case of casualty by fire or otherwise."

Among the cases cited in the Encyclopedia of Law
and by Taylor is the case of *Phillips v. Stevens, supra,* and
that case seems to have been relied upon in the cases
cited by us from New York, Illinois, California, and Iowa.
The court in *Phillips v. Stevens* based its decision upon the
principle that when one "by his own contract  *  *  *
creates a duty or charge upon himself he is bound to
make it good notwithstanding any accident by inevitable
necessity, because he might have provided against it by
his contract;" and this is the principle upon which the
cases from Illinois, Iowa, California, and New York men-
tioned above were decided.

No one can find fault with the principle that a man
should be compelled to perform what he has promised;
but, with all due respect to the supreme court of Massa-
chusetts, it seems to us that the court ignored the entire
issue.    The question there was not whether the lessee
was obliged to perform a covenant he had made, but the
question was what covenant he had made; that is,
whether his covenant to repair and keep in repair the
demised premises included within it a contract on his
part to rebuild the buildings on the leased premises if
they should be destroyed.    But in that case, as in the
other cases cited, and in every case that we have been
able to find which supports the contention of the appellee
here, it was taken for granted that the rule at common
law was that a covenant by a lessee to repair was equiva-
lent to and involved a covenant to rebuild.    Assuming,
however, that such was and is the rule of construction at
common law, are we bound by that rule?

Section 1, chapter 15, Compiled Statutes of this state,
provides that so much of the common law of England
as is applicable and not inconsistent with any law passed

or to be passed by the legislature of this state, is adopted
and declared to be law within the state.   Section 53,
chapter 73, Compiled Statutes, provides that "in the con-
struction of every instrument creating or conveying, or
authorizing or requiring the creation or conveyance of
any real estate, or interest therein, it shall be the duty of
the courts of justice to carry into effect the true interest
of the parties, so far as such intent can be collected from
the whole instrument, and so far as such intent is consist-
ent with the rules of law."   If, then, the rule at common
law is as is contended by the appellee, it is at most but a
rule of construction, and we are not bound to apply that
rule of construction to a real estate contract if to do so
would result in giving to the contract an effect not within
the contemplation or intention of the parties at the time
it was made.   We do not know why a lease for real estate
should not be construed as any other contract,—why we
should not apply to it the test universal among all civil-
ized peoples, namely, to look to the subject-matter of the
contract, the language of the parties, and ascertain, if we
can, what was their intention;  on what proposition did
the minds of the contracting parties meet;  what did they
consciously consent to.   If we apply this rule of construc-
tion to the contract under consideration we have for sub-
ject-matter of the contract a small tract of land, fifteen
acres of which was covered with water.   From this water
ice could be harvested in the winter season, and stored in
buildings then standing upon the leased premises.   The
lessee accepted his lease and entered upon these premises
to use them solely for the purposes of harvesting and stor-
ing ice.   When he did so he stipulated that the leased
premises were in good repair, in good condition, and he
promised that he would keep them in good repair and
at the expiration of his lease so surrender them.   What
did the parties to this contract understand and intend
by the terms "repair" and "keep in repair"?   These words
"repair" and "keep in repair" are not technical words,
nor should they be given a technical or strained interpre-

tation. They should receive their ordinary interpretation. To repair, as it is ordinarily used, means to amend, not to make a new thing, but to refit, to make good or restore an existing thing. (See *Todd v. Inhabitants of Rowley*, 8 Allen [Mass.], 51; *Stevens v. Milnor*, 24 N. J. Eq., 358.) When we speak of repairing a thing, the very expression presupposes something in existence to be repaired. If a carpenter contracts to repair a house, or a mason a chimney, the ordinary construction of these contracts would not be that these parties had agreed to build a new house or a new chimney. If the construction of the lessee's covenant contended for by the appellee here be correct, then had this entire tract of land and its buildings been swept away by a flood of the Missouri river, the lessee would be liable for their value to the lessor. Before we can say that a lessee assumed the liability of any such a contingency as that supposed, we must find his assumption of such a risk in the clear and express language of his contract.

In *Pollard v. Shaffer*, 1 Dall. [U. S.], 210, the lessee covenanted to pay rent and deliver up the premises in good repair. The lessor sued for a failure of the covenant to keep in good repair. The lessee pleaded that an alien enemy—the British army—invaded the city of Philadelphia, took possession of the leased premises, and committed the destruction made the subject of the lessor's action. The question was whether the special matter pleaded was a defense. The supreme court of Pennsylvania held that it was. In that case, as in the case at bar, it was insisted that the covenant of the lessee to keep the demised premises in repair bound him to restore the buildings if destroyed. The court said: "I am of opinion that the defendant is excused from his covenant to deliver up the premises in good repair: (1) Because a covenant to do this against an act of God or an enemy ought to be special and express, and so clear that no other meaning could be put upon it; (2) because the defendant had no consideration, no premium for this risk, and it

was not in the contemplation of either party.   *   *   *
Suppose when the lease was executed that the lessee had
been asked, 'Is it your meaning that in case the buildings
shall be destroyed by an act of God or public enemies you
are to rebuild or repair them?' His answer would have
been, unquestionably, 'No, I never entertained such an
idea.' Should the like question have been put to the
lessor, his answer would certainly have been 'No, I did
not expect anything so unreasonable.' "

In *Levey v. Dyess*, 51 Miss., 501, it was held that in the
absence of covenants by the lessee amounting to express
covenants to rebuild structures destroyed by casualty,
or by proof of negligence by the lessee, the loss is on the
landlord.

In *Warren v. Wagner*, 75 Ala., 188, the lessee covenanted
that at the expiration of the lease he would surrender
the premises in as good order and condition as they were
when he accepted them, usual wear and tear excepted,
and it was held that this covenant did not include an
agreement on the part of the lessee to rebuild the struc-
tures on the premises destroyed by fire. To the same
effect see *Howell v. Anderson*, 25 Tex., 557. In that case
the court said: "Leases are construed like other written
agreements, so as to give effect to the intention of the
parties." To the same effect *Warner v. Hitchins*, 5 Barb.
[N. Y.], 666. In that case the covenant of the lessee
was to surrender possession of the leased premises at
the expiration of the term in the same condition they
were in at the commencement of the lease, natural wear
and tear excepted. The leased buildings were destroyed
by fire and it was insisted in behalf of the lessor that the
covenants of the lessee included a covenant to rebuild.
But the court said that in order to hold the lessee liable
for the value of the destroyed buildings he must have
expressly agreed to rebuild them or restore them.

In *Wainscott v. Silvers*, 13 Ind., 497, the covenant of the
lessee was, at the expiration of the term, to surrender
the leased premises in as good condition as when they

were received.  The court said: "The law as between landlord and tenant we understand to be that the tenant is not responsible for buildings accidentally burned down during his tenancy, unless he has expressly covenanted or agreed to repair.  It is not sufficient to charge him that he agreed  *   *   *   to surrender the premises at the end of his term in the same repair or condition they were in at the time of the contract."

We reach the conclusion that an express agreement of a lessee to keep in good repair leased premises, and at the expiration of the term surrender their possession in as good condition as they were when he entered, natural decay, wear, and tear excepted, is not, and does not include, a covenant to rebuild buildings destroyed without his fault.

2. The lessor in this case is under no obligation to rebuild the destroyed buildings during the term, for the simple reason that he has not contracted so to do. (*Turner v. Townsend*, 42 Neb., 376.)

3. By the lease under consideration the premises were let to the lessee for a specified term, in consideration of which he covenanted to pay to the lessor a specific sum as rent, payable in installments on certain dates during the term.  The lease contained no provision binding the lessor to rebuild.  The lease contained no provision for any abatement of the rent promised, for any reason whatsoever.  The question presented is: A substantial part of the leased premises having been destroyed without the fault of either lessor or lessee, is the latter entitled to an apportionment of the rent accruing thereafter?  The common law construction of such a covenant as this would not relieve the tenant from payment of the entire rent reserved.  The old English case of *Paradine v. Jane*, Aleyn [Eng.], 26, was a suit on a covenant to pay rent.  The lessee defended the action on the ground that during the civil wars of England Prince Rupert, an alien born, with a hostile army, had driven him out of possession of the premises.  But the court decided that although the whole

army had been alien born enemies, the lessee was still bound to pay the entire rent reserved, because he had expressly covenanted so to do. This construction of the covenant to pay rent has been very generally followed in the United States. (See the rule stated and the authorities collated in 12 Am. & Eng. Ency. of Law, p. 741.) In 1787 the question was presented to the supreme court of Pennsylvania in *Pollard v. Shaffer*, 1 Dall. [U. S.], 210. In that case the lessee defended against an action for rent upon the ground that he had been deprived of the use of the premises by an alien enemy, namely, the British army. But the court followed the common law rule announced in *Paradine v. Jane, supra,* and held the lessee liable for the entire rent reserved. The principle upon which the court based its decision was (1) that the covenant to pay the rent was express, and (2) that since, by the lease, the lessee was to have the advantage of casual profits of the leased premises, he should run the hazard of casual losses during the term. The question was presented to the supreme court of Massachusetts in 1809, in *Fowler v. Bott*, 6 Mass., 62. The lease in that case was for a mill and it was destroyed by fire during the term. The court followed the common law rule and held that the lessee was liable for the entire rent reserved. In that case the court seems to have based its decision upon the ground that the lease amounted to a bargain and sale of the leased premises for the term. The common law rule of construction quoted above was also followed in *Fowler v. Payne*, 49 Miss., 42, *Harrington v. Watson*, 11 Ore., 143, *Womack v. McQuarry*, 28 Ind., 103, *Lanpher v. Glenn*, 33 N. W. Rep. [Minn.], 10, and in many other cases not necessary to cite here. Chancellor Kent, discussing the question under consideration, says: "It is well settled that upon an express contract to pay rent the loss of the premises by fire or inundation, or external violence, will not exempt the party from his obligation." (3 Kent, Commentaries [13th ed.], sec. 466.) The rule announced in *Paradine v. Jane* has been abolished by statute in the

state of New York, and perhaps some other states, and
the courts of last resort in the states of Kansas and South
Carolina have declined to follow the rule, but, with these
exceptions, we think it may be safely said that in every
other state where the rule has been presented for con-
sideration to the court of last resort it has been followed.
In 1832 the supreme court of Ohio announced an excep-
tion to this rule.  In that case the leased premises con-
sisted of a cellar or basement in a building several stories
high.  The entire building was destroyed by fire, without
the fault of the lessee, and the lease contained no cove-
nant on the part of the lessor to rebuild, and the court
held that the destruction of the leased premises termi-
nated the relation of landlord and tenant.  This case
was followed and the exception sustained in *Stockwell v.
Hunter*, 11 Met. [Mass.], 448; *Graves v. Berdan*, 26 N. Y.,
498; *Harrington v. Watson*, 11 Ore., 143; *Ainsworth v. Ritt*,
38 Cal., 89; *McMillan v. Solomon*, 42 Ala., 356.  Indeed,
the exception to the rule seems to be about as well estab-
lished in the United States as the rule itself.  In some
of the cases following the rule the reasons for its exist-
ence are said to be that it is only equitable that the lessee
should pay the entire rent notwithstanding a destruc-
tion of a part of the leased premises, since the lessor
must bear the loss of the destroyed property; and that
the enforcement of the rule tends to diminish the care-
lessness and increase the vigilance of a lessee.  We do
not know what reason led to the formulation of this rule,
but if the one quoted above is the correct one, it is of no
force at the present time, because the lessor may protect
his interest in the property while in the hands of the
lessee by insurance.  The reason given for the formula-
tion of the exception to the rule is that by a lease of a
room or basement in a building no interest in the soil
passes to the lessee, and that when the basement or room
is destroyed the leased estate is gone and the relation
of landlord and tenant terminated.  But it seems to us
that another principle underlies and controls the excep-

tion, and that is this: That the leased room or building having been destroyed without the fault of the lessee, the consideration for his promise to pay the rent accruing thereafter failed. The common law rule announced in *Paradine v. Jane* is merely a rule of construction of a real estate contract.

We have already seen to what extent the common law is in force in this state and have noted the command of the legislature to the courts of this state in construing real estate contracts to look to the subject-matter of the contract, the language employed by the contracting parties, and to ascertain if possible, and give effect to, the intention of the contracting parties. A lease for real estate is not a bargain and sale for a given time of the lessor's interest in the leased premises. It is rather a hiring or letting of property for a certain time and for a named consideration; and when a lessee covenants to pay rent for a term the consideration for that covenant is his right to the use and occupancy of the thing leased. In the covenant of a lessee to pay at stated times certain sums of money for the rent—that is, for the privilege or the right to use and occupy the leased premises—is involved the condition that such leased property shall be in existence and be capable of being used and enjoyed by the lessee. The promise to pay a stated sum of money as rent for leased premises for a certain term is based upon the presumption that the leased premises shall exist for the term. In the case at bar, if the lessee had been evicted from part of the demised premises by the holder of a title paramount to that of the lessor's, the lessee would be entitled to an apportionment of the rent. (Taylor, Landlord & Tenant, sec. 387, and cases there cited.) Under the exception established to the rule, had the entire leased premises been washed away by a flood, the relation of landlord and tenant existing between the parties to this suit would have from that moment ceased. This relation would not have been terminated by the act of the parties, but by operation of law, and the lessee would have been

relieved from the payment of rent accruing thereafter, upon the principle that the consideration for his promise to pay such rent had failed. If we look to the subject-matter of the lease under consideration and the language employed by the parties in making the contract, we cannot say that either of these parties, at the time they made this lease, had in contemplation the fact that the leased premises, or any part thereof, might be destroyed by a hurricane. They did not contract with reference to such a casualty. To use the language of McKean, C. J., in *Pollard v. Shaffer, supra,* had the lessor been asked at the time this lease was made, "Is it your intention to hold the lessee liable for the entire rent reserved in case the leased buildings shall be destroyed by cyclone?" he doubtless would have answered that he had never considered that contingency. If the question had been asked the lessee whether it was his intention to pay the entire $6,000 rent even if one-half of the leased property should be destroyed before the expiration of the term, it is very probable that he would have said that he had no such an intention. Yet in construing this contract we must, if possible, give effect to the intention of the parties, notwithstanding the common law rule of construction. To us it seems that the lessor, in effect, said to the lessee: "I own this tract of land and these ice houses; they are in good repair; they are fit for the purposes of harvesting and storing ice; I will hire them to you for five years if you will pay me $1,200 per year and keep the premises in good repair." To this the lessee assented. This was an offer and a promise upon the part of the lessor to furnish for the entire time the hired property; it was a promise and a covenant upon the part of the lessee to pay the monthly installments of rent for the right to use and occupy the hired property if it existed. But it was not a proposition on the part of the lessor to quitclaim his right to the use and occupancy of the leased premises to the lessee for five years in consideration of $6,000 paid, or to be paid, by the latter. This rule of construction of the

common law is a harsh and a technical one. We do not certainly know the conditions that existed when it was formulated, nor do we know in what reasons it had its origin, but we do know that since the decision of *Paradine v. Jane* the conditions of the race have changed; its conscience and intellect have been quickened, and this rule, however meritorious it may have been at the time and place of its origin, is opposed to the genius and spirit of the present age and in conflict with its judgment and conscience. In one or two instances, in states where its effect has not been even limited by statute, its applicability to real estate contracts in this country has been questioned. Such was the case of *Ripley v. Wightman*, 4 McCord [S. Car.], 447, where it was held that the fact that a house had been rendered untenantable by a hurricane afforded the lessee a defense to the action for the rent. In *Whitaker v. Hawley*, 25 Kan., 674, the buildings upon the leased premises were wholly destroyed by fire without the fault of the lessee, and the court held that because of the accidental destruction by fire of the buildings upon the leased premises the lessee was entitled to an apportionment of the rent. In that case Brewer, J., speaking for the court, said: "And right here it may be remarked that a lease is in one sense a running rather than a completed contract. It is an agreement for a continuous interchange of values between landlord and tenant rather than a purchase single and completed of a term or estate in lands." We are aware that this case stands practically alone, and in a foot-note to *McMillan v. Solomon*, 94 Am. Dec., 654, its isolation is pointed out with a remark by the editor that it is supported by "much charity and some logic." We approve of the opinion because we think it is good law as well as good sense. We approve of it also because it is a magnificent protest against slavish devotion to antiquated rules; and we approve of it because it breathes the spirit of humanity and equity and is based on a thought of the nineteenth century. We reach the conclusion that the common law rule

of construction under consideration is not in force in this state and formulate the rule as follows: Where a substantial portion of leased premises is destroyed without the fault of the lessee, he is entitled to an apportionment of the rent covenanted to be paid and accruing thereafter, in the absence of an express assumption by him of the risk of such destruction. The decree appealed from is reversed and the cause remanded with instructions to the district court to enter a decree in accordance with this opinion.

REVERSED AND REMANDED.

IRVINE, C., dissenting.

The case resolves itself into three general questions: First, is the defendant obligated to rebuild the ice houses; second, if not, is the plaintiff so obligated; and third, if neither party is obligated to rebuild, by what rule is the right to rent to be determined? On the first question we need do no more than express our entire approval of the reasoning and conclusions contained in the opinion of Commissioner RAGAN. We think a general covenant to repair cannot be reasonably construed as a covenant to restore buildings after their total destruction by the act of God, and that those cases which give that effect to such a covenant are sustained neither by reason nor well founded authority, as demonstrated in the opinion of Commissioner RAGAN. The cases supporting that view have been based on a misconception of the common law. We think, also, that in the absence of a covenant for that purpose the lessor is not obligated to rebuild. On the third question our conclusion is that under the facts stipulated the lessee, if it remain in possession, is bound to pay the rent reserved, without apportionment, for the whole term. We concede that there is much natural justice in the doctrine that on the destruction, without fault of the parties, of a substantial portion of the leased premises, the rent should be abated in proportion to the loss so sustained. The opinion of Commissioner RAGAN in

support of that view is as able an exposition as could well be made, but we think he fails to show a sound legal basis for his conclusion. It is admitted that with the exception of *Whitaker v. Hawley*, 25 Kan., 674, all the adjudicated cases are contrary to that view. We need not, therefore, review the authorities. *Whitaker v. Hawley* does substantially support the opinion expressed by Commissioner RAGAN. Still, that case is, to a certain extent, distinguishable from the one at bar. The lease there involved was of real estate and personal property. It was accepted as the established rule that the destruction by accident of personal property terminates the lease, and the court held that the mere fact that rent had been reserved in gross for both classes of property would not prevent the operation of this rule. This, we think, was the consideration really governing the case. The argument goes rather to justify a surrender of the lease than an apportionment of the rent, leaving the lease otherwise in force. We think it will be conceded that a doctrine established by a long line of authorities, unbroken, except, partially, by a single case, should not be abandoned without substantial and controlling reasons. The reasons for its abandonment, as stated in Commissioner RAGAN'S opinion, we take it, are these: That a lease does not operate as a bargain and sale, but merely as a hiring of the use of the premises; that under section 53 of chapter 73, Compiled Statutes, the lease is to be construed according to the intent, without regard to technical rules of law; that the reasons given for the prevailing rule have failed because the landlord may now insure his interest; that the rule is unjust and contrary to the enlightened spirit of the nineteenth century. In the first place, we cannot agree that the effect of the lease is merely to pass to the lessee the use of the premises, without creating an estate. From time immemorial it has been considered that a lease passes the estate for the term, leaving in the lessor the reversion and rent issuing out of the demised term. We do not think that the statute referred to

changes this rule. It doubtless makes it competent for the parties, by appropriate language, to contract differently, but the statute is in this respect merely declaratory of the common law. As said by Lord Ashurst in *Doe v. Burt*, 1 Term R. [Eng.], 701: "The construction of all deeds must be made with reference to their subject-matter, and it may be necessary to put a different construction on leases made in populous cities from that on those made in the country." To give the statute as broad a construction as claimed would abrogate the rule in Shelley's case and many other settled principles of real estate law. It would make every mortgage a conveyance of the legal title, subject to strict foreclosure, and would render all bonds and penalties enforceable according to their terms. It is hardly too much to say that it would destroy nearly all general principles of contract law, and leave in force only those rules whereby the intention of the parties is to be determined. As to the argument that the landlord may insure, and that, therefore, there exists no longer the reason given for the prevailing rule, that it is but fair that the lessee should bear part of the loss, the answer is double. In the first place, the reason given can hardly be accepted as the true reason for the prevailing rule, and in the second place, while the landlord may insure, his insurance extends only to his reversionary interest, while the tenant has also an insurable interest and may protect himself against such a loss by insuring his term. Finally, it is not for the court to abrogate or to reform contracts because of apparent inequity or injustice in their provisions. If the nineteenth century has advanced in civilization so far as to require the disregard of established legal principles merely because they are antiquated, this modern enlightenment must certainly have extended so far as to justify a presumption that the parties to a contract have sufficient intelligence to anticipate probable disasters and provide therefor if they so desire. We think the reasons alleged are entirely insufficient to justify an innovation on established legal

principles. As we said before, rules settled by a long
and uniform course of judicial decisions should not be
lightly disregarded. This lease is couched in technical
language which has uniformly been considered as creat-
ing an estate in the lessee for the term demised, and when
the parties have resorted to such technical language it
is to be presumed that it was intended in its technical
sense. It is not the business of the courts to make new
contracts for the parties, and we cannot see how we can
enter here a judgment or decree continuing the lease at
a rent different from that therein reserved without, in
effect, making for the parties a new contract, different
from that which they made for themselves. The lessee
might have protected itself by a suitable provision
against such a catastrophe. If insurance has anything
to do with the case, it might have protected itself by in-
suring its term. There is technically no difference be-
tween the present case and the case of an outstanding
estate for life, with a remainder or reversion over. In
such case the destruction of improvements is a loss to be
borne both by the particular tenant and the remainder-
man. The lessor cannot protect himself and secure his
rent by rebuilding, because in the absence of a covenant
he could not re-enter for that purpose without eviction.
So that to hold that there should be an apportionment
where the tenant is unwilling to permit a rebuilding
would arbitrarily deny to the landlord any right to his
whole rent. We think the law is exactly stated in a very
exhaustive opinion by Willard, J., in *Coogan v. Parker,*
2 S. Car., 255, to the effect that where there is a substan-
tial destruction of the subject-matter of the lease by act
of God or the public enemy, the tenant may elect to
rescind, and on surrendering shall be discharged from
the payment of the rent; but unless he elect to rescind
by surrender, or offer to surrender, he must pay the rent
according to his covenant, and that in determining what
amounts to a substantial destruction of the subject-
matter the nature of the premises and the use which the

parties intended should be made thereof are to be considered. This doctrine reconciles cases supporting the general rule announced with those holding that where a room in a building is let, and the building is destroyed, the rent is extinguished, because in such a case there has been a complete eviction or surrender. Where, however, there has been only a partial destruction, and the lessee sees fit to continue the lease and remain in possession, he must so do according to its terms and pay the rent reserved.

Post, C. J., and Ryan, C., concur in the foregoing dissenting opinion.