D & R REALTY, A NEBRASKA GENERAL PARTNERSHIP, APPELLANT AND CROSS-APPELLEE, V. ROBERT J. BENDER AND LAVERN J. BENDER, APPELLEES AND CROSS-APPELLANTS.

431 N.W.2d 920

Filed November 10, 1988.    No. 86-924.

Robert R. Steinke, of Allphin & Steinke, and David E. Pavel for appellant.

Mark M. Sipple and Eugene G. Schumacher, of Luckey, Sipple, Hansen, Emerson & Schumacher, for appellees.

BOSLAUGH, CAPORALE, and GRANT, JJ., and BUCKLEY, D.J., and COLWELL, D.J., Retired.

GRANT, J.

This is an appeal from the district court for Platte County. Plaintiff-appellant, D & R Realty (D & R), a Nebraska general partnership, brought this action against defendants-appellees, Robert J. and LaVern J. Bender (Benders).

The record shows that on March 1, 1979, the Benders, as lessees, entered into a written lease agreement with the lessor, D & R. The Benders leased 160 acres of farmland near Monroe for 3 years and, as annual rental, were to deliver 7,000 bushels of No. 2 yellow corn to D & R by December 1 of each year. Approximately 130 of these acres were irrigated by a center pivot sprinkler. Through a series of subsequent extensions of the lease, the Benders farmed the land until the end of the 1984 crop-year.

Sometime during July of 1982, lightning damaged a motor control on the center pivot. While the Benders were charged with securing insurance for such events, the lease agreement required D & R to make all premium payments. The insurance secured by the Benders and paid for by D & R covered all but $956.79 of the cost to repair the motor control. A dispute arose as to which of the parties was responsible for this cost. Benders

paid the balance and withheld a like amount from their 1982 rental payment. After D & R refused to negotiate an extension of the lease, the Benders paid an additional $956.79 to D & R, and D & R extended the lease for the 1983 crop-year.

During the spring of 1984 a series of torrential rains flooded the Monroe area. Because of these rains, the Benders were able to plant only 97.5 acres of the leased land. On January 25, 1985, 55 days after the lease payment in corn was due, the Benders tendered to D & R a cash payment of $13,008.84 based on the number of acres they were able to farm and calculated on the market value of the type of corn specified in the contract. This pro rata payment was accepted by D & R as a partial payment on the annual rental.

In May of 1985, D & R brought suit (as tried in two causes of action), seeking to recover (1) the difference in the amount paid by the Benders and the value of 7,000 bushels of corn, and (2) damages caused by Benders in claiming a right to lease the farm for the 1985 crop-year. The Benders counterclaimed, seeking to recover (1) $956.79 paid to D & R for repairs necessitated by the lightning damage to the center pivot irrigation system; (2) $2,425, representing one-seventh of the center pivot system improvements made by defendants in 1979 under the lease; and (3) damages incurred as a result of D & R's termination of the lease.

After a trial to the court, the court sustained Benders' motion to dismiss D & R's second cause of action, and no error is assigned as to this ruling. The district court in its memorandum opinion found in favor of Benders on D & R's petition with respect to the 1984 lease payment, found in favor of D & R on Benders' counterclaim for $956.79, rendered judgment for $2,425 in favor of Benders as to their counterclaim representing one-seventh of the center pivot system improvement, and found in favor of D & R on Benders' counterclaim for wrongful termination of the lease.

D & R appeals, assigning six errors, which, as argued in its brief, may be summarized as errors in the trial court's actions (1) in overruling D & R's motion that the court make specific findings of fact; (2) in finding in favor of Benders on D & R's petition, when the lease required full payment notwithstanding

the fact that not all of the leased land could be planted; and (3) in rendering judgment on Benders' counterclaim for $2,425, representing one-seventh of the center pivot improvement installed by Benders, when D & R was legally justified in not renewing the lease for the 1985 crop-year because of Benders' late and partial lease payment for the 1984 crop-year.

Benders cross-appeal, assigning four errors, which, as argued, may be summarized as errors in the trial court's actions (1) in rendering judgment in favor of D & R on Benders' counterclaim for $956.79 paid for repairs based on the court's finding there was an accord and satisfaction on that issue, and (2) in dismissing Benders' counterclaim for wrongful eviction.

We affirm the trial court's action in dismissing D & R's petition and affirm in part and reverse in part the trial court's actions on Benders' counterclaim.

The record further shows that during the last weeks in April 1984, when farmers normally planted in the Monroe area, unusually heavy rains flooded the area. Robert Bender testified that "[w]ater began to flow out of the sandhills, which is extremely out of the ordinary. It has never happened in most people's lifetime." An employee of the Platte County Agricultural Stabilization and Conservation Service (ASCS) testified at trial that there was more water in the area than he had ever seen before. The ASCS employee also testified that measurements conducted by his office showed that only 97.5 acres of the D & R property could be planted.

In May of 1984, Robert Bender contacted the two principals of D & R, Don and Roger Erftmier, about the flooding problems. The Erftmiers were apparently indifferent to Benders' problems with the flooding. Roger Erftmier told Robert Bender that if he did not farm the ground he was going to hire a custom farmer and would sue for any deficiency. Bender then wrote to Don Erftmier, requesting permission to plant soybeans rather than corn. Don Erftmier granted the request but stated that he still expected to be paid in corn.

Some 2 months after the normal planting season, floodwaters receded to the point that the Benders were able to plant 97.5 acres of the leased land in soybeans. The remaining leased acres could not be planted.

At the conclusion of the crop-year, and after December 1, 1984, Benders paid D & R $13,008.84 in cash. The time of this payment was beyond the date required by the contract. In determining this amount the Benders divided the 130 irrigated acres into the 7,000 bushels to find the per-acre bushel requirement. The Benders then multiplied this result by the 97.5 acres they were able to farm. They then multiplied this result by $2.48, the agreed value of No. 2 yellow corn on December 1, 1984. D & R accepted the Benders' tender as partial payment to mitigate damages.

D & R in its petition sought to recover the balance of the corn due under the terms of the lease. In support of its prayer for these damages, D & R relies on the following provision in the lease:

> Though the anticipated profits from the Farm crop will significantly exceed [7,000 bushels], the fact that such crop fails entirely or does not exceed such bushel requirement will in no way relieve the Farmers from delivering [7,000 bushels] of corn to the Owner. Farmers [Benders] acknowledge that it may be necessary to purchase and Farmers agree to purchase such quantity of corn from other sources in order to comply promptly with the provisions of this subparagraph.

D & R contends that this provision places the entire loss caused by the flood on the Benders. The trial court did not agree, nor do we. While the burden of such a contingency may be placed on a party by agreement, this court will not strain the language of an agreement to do so. The record shows that the lease was prepared by D & R, and, under settled law, any ambiguities in a lease should be construed against the party preparing the lease. *May v. Marijo Corp.*, 207 Neb. 422, 299 N.W.2d 433 (1980). The Benders' crop did not fail. They were prevented from planting the entire acreage because of a flood. A flood, characterized at trial as unlike any in memory, could not be within the contemplation of the parties when the agreement was executed.

In *Wattles v. South Omaha Ice & Coal Co.*, 50 Neb. 251, 69 N.W. 785 (1897), we held that where a substantial portion of leased premises is destroyed or rendered incapable of being used

by a lessee, the lessee is entitled to an apportionment of the rental to be paid, in the absence of an expressed assumption of the risk of such destruction.

The view adopted in *Wattles, supra,* is reflected in Restatement (Second) of Property § 5.4 (1977). Unless a tenant has agreed to assume a risk, he will not be required to pay rent on leased property rendered valueless for his purposes through no fault of his own. D & R argues that the flooding of the property was not an act of God. Testimony at trial shows that the floodwater did not reach the property until a neighbor channeled the water across a road to the D & R property. The rule from *Wattles, supra,* is not limited to acts of God, but may extend to conditions created through no fault of the tenant. The Benders' partial payment for 1984 was proper except for its timeliness under the terms of the lease.

D & R also assigns as error the district court's denial of its motion for findings of fact and conclusions of law. Pursuant to Neb. Rev. Stat. § 25-1127 (Reissue 1985), a party, "with a view of excepting to the decision," may request a court to "state in writing the conclusions of fact found separately from the conclusions of law." The record shows that D & R did not make a motion under § 25-1127 until after the judgment herein was entered. Counsel for the Benders, however, did make such a motion, before the trial began, and the statute sets out that the findings must be made if one of the parties requests such findings. Section 25-1127 is mandatory in form, and we have so held. See *Dormer v. Dreith,* 145 Neb. 742, 18 N.W.2d 94 (1945). On request, the trial court should follow the dictates of the statute. Nonetheless, we held in *In re Guardianship of Lyon,* 140 Neb. 159, 164, 299 N.W. 322, 324-25 (1941), "While this section of the statute is mandatory . . . a failure by the trial court separately to state findings of fact or conclusions of law is not reversible error, when the record affirmatively shows that such failure worked no injury to appellant." While we do not approve of the trial court's action in not honoring the request to set out, in writing, findings of fact and conclusions of law, with regard to the entire case, there is no prejudice to appellant in the court's action. The questions presented are primarily questions of law with regard to the interpretations of a contract. The

action of the trial court in this regard, while erroneous, was not prejudicial to D & R. The court's action in not setting out findings of fact and conclusions of law does not require reversal on that ground.

Appellant D & R also assigns as error the action of the trial court in rendering judgment for Benders, on Benders' counterclaim, for repayment of a portion of the center pivot system improvement installed by Benders under the lease. Pursuant to the lease agreement between the parties, D & R agreed to return to the Benders a pro rata portion of the costs of the center pivot improvement should the Benders not farm the property during the fourth through seventh years because of D & R's actions. This provision, paragraph 6D, states as follows:

> Owner acknowledges that the Farmers intend to add a substantial improvement to the pivot system at the Farmers expense. The Owner agrees that, in the event the Farmers do not farm the property during years 4 through 7 because of an action on the Owners part, the Owner will reimburse the Farmers for the remaining unused portion of the pivot improvement on the basis that the improvement has a seven year life. In the event the Farmers do not farm the property during the years 4 through 7 because of an action on their part, the Owner will reimburse the Farmers for the remaining unused portion of the pivot improvement, less one year, on the basis that the improvement has a seven year life.

(Emphasis omitted.) The lease also contained the following provision, in paragraph 10C:

> The Farmers agree that if they or either of them fail to observe or perform any of the conditions or covenants imposed upon them hereby, then the Owner shall have the right to declare this Agreement terminated and upon so declaring the Owner shall have the right to reenter and repossess the Farm and shall be entitled to any and all crops and improvements thereon as liquidated damages for the Farmers' default hereunder.

The district court, "taking into account the mode and manner of which the lease was not renewed," held that the Benders were entitled "to 1/7th of the initial improvement cost

of the pivot . . . reflected in the evidence and without contradiction" to be $2,425, as one-seventh of the initial cost of $16,975 for the center pivot improvement.

D & R contends that the Benders, by failing to tender 7,000 bushels of corn on or before December 1, 1984, breached the lease agreement. We read the lease more broadly than the Benders, who argue only an election by them not to farm would prevent them from recovering the final pro rata pivot improvement cost, and agree with D & R that both of the before-mentioned provisions when read together indicate that any breach by the Benders would prevent Benders from any entitlement to this payment. Under *Wattles v. South Omaha Ice & Coal Co.*, 50 Neb. 251, 69 N.W. 785 (1897), the Benders were within their rights in making a reduced payment because of the flood in 1984. The Benders, however, delayed making any payment until almost 2 months after the December 1, 1984, due date. The Benders contend that the parties were negotiating a settlement during this period, which excused them from promptly tendering payment. The record shows that D & R opted to declare the agreement breached as a result of this delay, prior to accepting the Benders' tender in order to "mitigate damages." The Benders, by not tendering payment on or before December 1, 1984, breached the agreement and are not entitled to any amount set forth in paragraph 6D of the lease.

Also dispositive on this issue is the language of the contract stating that the center pivot improvement had a 7-year life and that if the Benders' actions prevented them from farming in the last 4 years of the possibly extended contract, D & R would reimburse Benders "for the remaining unused portion of the pivot improvement, less one year." (Emphasis omitted.) At the time of the termination of the contract, the Benders had used the improvement for 6 years and were not entitled to any reimbursement. The trial court's judgment in favor of Benders on the counterclaim concerning the reimbursement of the seventh year's pivot improvement under paragraph 6D is reversed.

The Benders cross-appeal for the return of the $956.79 paid to D & R in 1982 is without merit. The claim was made some 2 years after the fact, and only after D & R brought suit. The

district court's decision that the parties had reached an accord and satisfaction on this issue in extending the lease for the 1983 crop-year is affirmed.

The Benders' assignment of error in the trial court's action in dismissing the Benders' counterclaim for wrongful eviction is also without merit. As set out above, the record shows that the Benders breached their lease agreement with D & R by not timely tendering even partial payment for the acres they farmed in 1984. The action of the trial court in dismissing that portion of the counterclaim is affirmed.

AFFIRMED IN PART, AND IN PART
REVERSED AND DISMISSED.

COLWELL, D.J., Retired, dissenting.

I respectfully dissent from those parts of the majority opinion holding (1) defendants were not obligated under the lease to deliver the full quantity of 7,000 bushels of rental corn to plaintiff in satisfaction of their lease agreement, and (2) the court's failure to make separate findings as required in Neb. Rev. Stat. § 25-1127 (Reissue 1985) was not prejudicial error.

Basically, I disagree with the position of the majority that the facts show defendants were prevented from planting all of the land because of a flood. I contend that any interference in defendants' possession (planting) was caused by the independent unlawful acts of third parties diverting surface waters that had accumulated and concentrated in volume on land across the road from the leased land so that the water "backed up" upon the leased land.

"Floodwaters" are waters that spill over banks of a stream during high water, flow over adjacent lands in the stream's flood plain, and return to the stream at a point or points downstream. *Belsky v. County of Dodge*, 220 Neb. 76, 369 N.W.2d 46 (1985). "Surface water" is water which appears upon the surface of ground in a diffuse state, with no permanent source of supply or regular course, which ordinarily results from rainfall or melting snow. Diffused surface waters may be dammed, diverted, or otherwise repelled, if necessary, and in the absence of negligence. However, when diffused surface waters are concentrated in volume and velocity and flow into a natural depression, draw, swale, or other

drainageway, the rule as to diffused surface waters does not apply. See, *Shotkoski v. Prososki*, 219 Neb. 213, 362 N.W.2d 59 (1985); *Nichol v. Yocum*, 173 Neb. 298, 113 N.W.2d 195 (1962).

Defendant Robert Bender described how the water reached the leased land:

> Approximately the last week of April water began to flow. We had a lot of rain. Water began to flow out of the sandhills, which is extremely out of the ordinary. It has never happened in most people's lifetime. It started flowing out of the sandhills and began running and flooding property on down on the west side of the road.

Bender stated,

> When the flood came, the water was on the west side of the road and it would have remained on the west side of the road until some neighbors had dug underneath the road and caused it to cave in allowing the water to cross over to the east side of the road, and the County did not correct that and caused the water to come over there and back up into Mr. Erftmier's property.

Bender further testified,

> Q. Now, of what significance, if any, [is] the fact that this road broke through or gave way and the water flowed through the road?
>
> A. Well, that's what allowed the water to go on the east side, which eventually backed up into my property and Erftmier's property on the east side of the road after flooding on the west, and then I was surrounded on both sides.
>
> Q. Where this break or gap in the road occurred and where water flowed across and through, how far is that from the Erftmier, D&R Realty, property?
>
> A. Approximately a half mile. The road opening was approximately a half mile to the north of the D&R Realty property.

It is a general rule that a third person who causes an injury to the use or possession of leased premises is liable to the tenant in possession. See, 51C C.J.S. *Landlord & Tenant* § 354 (1968); *Ristine v. Geigy Agricultural Chemicals*, 188 Neb. 550, 198 N.W.2d 199 (1972).

Cropland farmers are keenly aware of farming risks involving the uncertainties of weather, such as extreme heat, drought, excessive rainfall, and the accumulation and pooling of water after heavy rains, and, by the very nature of that business, farmers assume those hazards and risks whether they own or lease the land, albeit defendants here were assured needed water via the irrigation system. By the terms of the written lease between the parties, defendants lessees assumed those usual risks of farming that related to weather conditions. At the same time, defendants had the right to plant the 160 acres free from any interference from third persons, including the diversion of water. See *Slusarski v. County of Platte*, 226 Neb. 889, 416 N.W.2d 213 (1987).

The record is limited concerning the character of the water, natural depressions, water courses, channels, and swales on the west side of the road, and also concerning the circumstances of the county road holding back the water; however, a finding could be made that the accumulated water on the west side of the road was diffused surface water concentrated in volume and velocity, and it was unlawful for third persons to divert the water to the damage of a neighbor, and defendants had a possible cause of action against those third parties.

The majority relies on the rule in Restatement (Second) of Property § 5.4 at 194-95 (1977),

> Except to the extent the parties to a lease validly agree otherwise, there is a breach of the landlord's obligation if, after the tenant's entry and without fault of the tenant, a change in the condition of the leased property caused by the landlord's conduct or failure to fulfill an obligation to repair, *or caused suddenly by a nonmanmade force*, makes the leased property unsuitable for the use contemplated by the parties . . . .

(Emphasis supplied.) That rule is not applicable here for the reason that the change in the condition of the leased land was not "caused suddenly by a nonmanmade force"; rather, it was caused by the manmade force of third persons changing the county road and diverting the water. Further, the Restatement, *supra* at comment *i*. at 200, provides,

> A third person, not acting for the landlord, may

intentionally, negligently or accidently damage the leased property and the changed condition may prevent the tenant from using the property in the manner contemplated by the parties. Though the rule of this section is not applicable in that case, the tenant may have an action for damages against the third person for his conduct.

As I understand the position of the majority, the accumulated water (flooding) on the leased land made applicable the rule in *Wattles v. South Omaha Ice & Coal Co.*, 50 Neb. 251, 268, 69 N.W. 785, 790 (1897), "Where a substantial portion of leased premises is *destroyed without the fault of the lessee*, he is entitled to an apportionment of the rent covenanted to be paid and accruing thereafter, in the absence of an express assumption by him of the risk of such destruction." (Emphasis supplied.)

The facts in *Wattles* are distinguishable. Wattles leased a 15-acre pond and icehouses used to store ice; the icehouses were destroyed by windstorm, commonly called an act of god; and the court ordered apportionment of the rental, forgiving the months when the icehouses could not be used. In the case at bar, surface waters had accumulated on farm ground across the road and some distance north of the leased premises, and when some neighbors disturbed or changed a county road, they caused the water to cross over the road and back up upon the leased land, to defendants' damage. While the accumulation of water across the road had its origin in unusually heavy rainfall, it neither caused damages nor interfered with defendants until the tortious acts of some unidentified third parties changed the road.

It is significant in *Wattles* that the court's discussion concerned leased premises that were either "destroyed" or "no longer existed," or, in the case of flooding, the land was "washed away." None of those facts were present here; rather, the land remained and defendants were prevented from planting a crop on a part of leased premises, which should not be cause for apportionment of rent. See Annot., Modern Status of Rule as to Tenant's Rent Liability After Injury to or Destruction of Demised Premises, 99 A.L.R.3d 738, 739

(1980):

> A number of modern cases dealing with the issue of the tenant's rent liability after destruction of the demised premises support the view that, in the absence of a lease or statutory provision respecting the issue, the tenant's rent liability depends on whether the thing leased remains after the injury or destruction. Thus, provisions of the lease which outline the extent of the premises demised become a focal point for these courts, which then compare such lease provisions with the extent of the destruction in particular cases in order to determine whether the tenant remains liable for rent. While the courts have exhibited varying degrees of strictness in reading lease provisions regarding the extent of the premises demised, in general the courts have held that the tenant remains liable for rent if any part of the demised premises remains that is capable of being occupied and enjoyed by the tenant, but that rent liability is extinguished if the thing demised has been totally destroyed. The latter view is sometimes expressed as an exception to the common-law rule that a tenant remains liable for rent notwithstanding injury to the premises.

Concerning the terms of the lease relating to consideration, the lease clearly provides that lessees shall deliver 7,000 bushels of corn to the lessor as payment for the annual rent. This is a "cash lease" arrangement where the medium is corn instead of cash. The paragraph in the lease discussed by the majority concerning anticipated profits, etc., was a further explanation and understanding between the parties that 7,000 bushels of corn must be delivered as rent annually. It was not a contingency, and it did not create an ambiguity.

Lastly, the majority holds as neither prejudicial nor reversible error the failure of the trial judge to make separate findings as required by § 25-1127. Such findings are mandatory in a law case and helpful in equity actions. See, *Dormer v. Dreith*, 145 Neb. 742, 18 N.W.2d 94 (1945); *Carl v. Wentz*, 116 Neb. 880, 219 N.W. 390 (1928). The absence of such findings in an equity case may not be prejudicial because of the court's de novo review. *Fee v. Fee*, 223 Neb. 128, 388 N.W.2d 122 (1986).

The purpose of § 25-1127 is to provide appellants with a basis to question the rulings of the court upon the legal questions involved. See *Fee v. Fee, supra.* The mandatory rule is important here, since the evidence is limited and there are no findings of fact concerning the cause of the water "backing up" onto the leased land. Appellant is also faced with the rule that the general findings of the trial court in a law action in which the jury is waived have the effect of a verdict of a jury and will not be disturbed on appeal unless clearly erroneous. See *Alliance Nat. Bank v. State Surety Co.*, 223 Neb. 403, 390 N.W.2d 487 (1986). On several occasions this court has directed litigants' attention to their failure to request the court to make findings as provided in § 25-1127, and now the majority holds that such failure is not prejudicial anyway. The provisions of § 25-1127 being mandatory, it was prejudicial for the court to fail to make such findings, and it was reversible error.

The judgment in favor of defendants on plaintiff's first cause of action should be reversed, and that cause remanded for a new trial on that issue. The judgment entered in favor of defendants on their counterclaim for repayment of a portion of the center pivot improvement should be set aside, and that cause remanded with directions to make separate findings of fact and conclusions of law, pursuant to § 25-1127, and to enter judgment thereon.