**AMOCO OIL COMPANY, Appellant,**

v.

**Llewellan K. JONES, Respondent.**

**No. C8–90–1933.**

Court of Appeals of Minnesota.

March 19, 1991.

Thomas A. Pearson, Lisa M. Elliott, Arthur, Chapman & McDonough, P.A., Minneapolis, for appellant.

Robert S. Cragg, Cragg & Fobbe, Hopkins, for respondent.

Considered and decided by PARKER, P.J., and HUSPENI and MULALLY *, JJ.

## OPINION

EDWARD D. MULALLY, Judge.

Amoco Oil Company challenges a directed verdict for respondent Llewellan K. Jones, claiming material fact issues exist regarding Jones' obligation to rebuild or restore leased property under a general repair and delivery covenant. We affirm.

## FACTS

Respondent Jones operated a gas station which he had leased from appellant Amoco Oil Company (Amoco) since 1968. In general, Amoco agents provided a standard lease form for Jones' signature. Jones testified minimal negotiation was involved, "they presented the lease and you signed it or not." The parties entered the lease in question on October 26, 1984. The lease terms prohibited Jones from committing waste to the property, and further required that:

(b) Lessee shall keep the Premises, together with the adjoining sidewalks and entrance driveways, in good repair, appearance, and order; and, at the expiration of this lease, or upon sooner termination thereof, Lessee shall surrender the Premises to Lessor in substantially as good condition as when received, ordinary wear and tear excepted.

(c) Lessee shall perform necessary upkeep and maintenance to the Premises, and in so doing shall follow reasonable guides outlining proper care which Lessor may from time to time provide to Lessee. Lessee shall keep the Premises, including adjoining areas, alleys, and sidewalks, in clean, safe, and healthful condition.

The lease did not indicate which party was responsible for obtaining fire insurance. However, under the lease Amoco could terminate or choose not to renew the lease upon the occurrence of a variety of events, including:

(j) Destruction of all or a substantial part of the Premises, it being understood that if the Premises are rendered untenantable, rent shall abate as of the date the Premises are rendered untenantable. In the event the Premises shall be subsequently rebuilt or replaced by Lessor and operated under a lessee franchise relationship, Lessor shall grant to Lessee a thirty (30) day right of first refusal of the new franchise * * *.

Fire broke out in the early morning of December 24, 1985, causing substantial damage and destruction to the station. Parts of the building suffered heavy smoke damage only, while other parts were nearly gutted. Neither party was negligent or otherwise at fault in causing the fire.

After the fire, Amoco terminated the lease because of "destruction of all or a substantial part" of the property. In its letter to Jones, Amoco stated "[t]he premises now cannot be used for a gasoline service station or anything else because of the level of damage to the structure and utility services." Amoco also stated that an Amoco representative would contact Jones "to discuss whether or not you would be willing to work with Amoco and contribute to rebuilding the premises." Amoco contacted a general contractor to inspect the property and submit an estimate for the cost of repairing or rebuilding the station. After receiving the estimate, Amoco leveled the remaining structure. Amoco then sued Jones for breach of the lease, alleging Jones failed to return the station to Amoco in as good condition as when he received it.

At the jury trial Amoco's expert witness, Thomas Shamp, a general contractor, testified the reasonable cost of repairing the station was $118,850. Shamp testified parts of the station needed to be gutted— that he would take off "the skin" and reuse the shell of the building. Shamp also testi-

---

* Retired judge of the district court, acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 2.

fied the roof needed to be completely replaced, as did some wall partitions, door jambs, and bathroom fixtures. Shamp stated other parts of the building (porcelain panels, floor tiles) could be cleaned and reused, although he did not know how effective the cleaning would be.

At the close of Amoco's evidence, the trial court directed a verdict in Jones' favor. The trial court found the lease terms did not contain a covenant to restore the property to its original state in the event of such severe destruction or damage, that Jones did not breach the lease, and entered judgment in favor of Jones. Amoco appeals.

## ISSUE

Does a general repair and delivery covenant obligate a lessee to rebuild property destroyed or substantially damaged by fire, where the lessee is not at fault?

## ANALYSIS

### Standard of Review

On a motion for a directed verdict, the trial court must determine, as a matter of law, whether the evidence is sufficient to present a fact question for the jury. *Midland Nat'l Bank v. Perranoski*, 299 N.W.2d 404, 409 (Minn.1980). The evidence is viewed in the light most favorable to the nonmoving party. *J.N. Sullivan & Assocs., Inc. v. F.D. Chapman Constr. Co.*, 304 Minn. 334, 336, 231 N.W.2d 87, 89 (1975). On appeal, this court determines whether the evidence and its inferences could have reasonably sustained a contrary verdict. *Northwestern State Bank v. Gangestad*, 289 N.W.2d 449, 453 (Minn. 1979).

### Common Law Rule

At common law, a lessee's covenant to repair property included an obligation to rebuild structures destroyed during the lease term, regardless of the lessee's fault in causing the destruction. *See Lewis v. Real Estate Corp.*, 6 Ill.App.2d 240, 244, 127 N.E.2d 272, 275 (Ill.App.Ct.1955). A lessee's covenant to return the leased property in the same condition as it was at the time of the letting, often combined with a covenant to repair, also imposed an obligation to rebuild, unless the lessee limited the covenant. *Wattles v. South Omaha Ice & Coal Co.*, 50 Neb. 251, 256–58, 69 N.W. 785, 786 (1897). *See also* Annot., 45 A.L.R. 12, 60–63 (1926). This rule arose because, at common law, the landlord conveyed an interest in the land to the tenant, who became the "owner" for the lease term. 1 M. Friedman, Friedman on Leases § 9.1 at 305–6 (1974).

> The common law rule may not have been inappropriate at the time * * *—an agricultural lease in which the improvements were merely incidental. Damage to the house, or its destruction, might make life inconvenient but the land was still tillable.

*Id.* at 313. Thus, when the tenant covenanted to repair the property and return it in the same condition as when the lease was executed, the covenant included an obligation to rebuild regardless of the cause of the destruction.

### Modern Trend

Jurisdictions are split regarding whether a general repair and delivery covenant requires a tenant to rebuild where the tenant is not at fault. *Compare Lewis*, 6 Ill. App.2d at 244, 127 N.E.2d at 275 (applying common law rule) *with Wattles*, 50 Neb. at 262, 69 N.W. at 788 (holding general repair and delivery covenant does not include covenant to rebuild). Some states have modified the rule by statute. *See, e.g.*, W.Va. Code § 36–4–13 (1988). Courts that have refused to apply the common law rule have done so on the ground that one cannot repair that which does not exist. *See, e.g.*, *Realty & Rebuilding Co. v. Rea*, 184 Cal. 565, 576, 194 P. 1024, 1029 (1920) ("To repair means to mend an old thing, not to make a new thing; to restore to a sound state something which has become partially diliapidated (sic), not to create something which has no existence.")

This distinction between "repair" and "restore" rescued some tenants who had naively agreed to repair, with no suspicion of what the common law attributed to this covenant. However, a repair is a

360

partial restoration and these terms do not necessarily present a clear contrast. Their difference may be of degree rather than of nature.

Friedman, § 9.1 at 307. Rather than rely on "magic words" to create a covenant to rebuild, courts look to the intent of the parties at the time of the lease execution and the plain meaning of the language used. *Washington Hydroculture, Inc. v. Payne*, 96 Wash.2d 322, 328, 635 P.2d 138, 141 (1981).

■ While Minnesota case law establishes a lessee's duty to repair leased property damaged through the lessee's negligence, these cases do not mandate application of the common law rule. *See Storr v. Keljik*, 178 Minn. 391, 227 N.W. 211 (1929) (lease terms clearly dictated lessee's duty to repair damage resulting from temporary changes made during lease period); *Rustad v. Lampert*, 149 Minn. 363, 183 N.W. 843 (1921) (where lessee's negligence caused boiler to crack, lessee obligated to replace it under lease terms). Amoco contends a fact question exists regarding Jones' liability because the station suffered substantial damage which could be repaired without rebuilding the entire station. Under the common law rule this argument may have merit; however, we believe the common law rule is arbitrary and outdated. Application of the "magic" language places an unforeseen burden on the lessee—a burden which is most often outside both parties' contemplation. A lease is a contract which should be construed according to ordinary rules of interpretation. We believe the better approach is to interpret the lease according to its plain language to ascertain the parties' intent.

■ Because we reject the automatic application of the common law rule, Amoco's distinction between destroy and damage is irrelevant. Shamp's testimony does not bear on the parties' intent. Amoco drafted the lease, thus the lease is construed against Amoco. *See Turner v. Alpha Phi Sorority House*, 276 N.W.2d 63, 66 (Minn. 1979). Amoco did not present any evidence to suggest the parties intended Jones to assume the risk of loss by fire. Rather,

the plain language of the lease speaks of Jones' responsibility for "necessary upkeep and repairs," including maintenance of sidewalks and driveways. We agree with the trial court's conclusion that Amoco did not carry its burden to show the parties intended Jones to rebuild the property in the event of substantial damage or destruction.

## DECISION

The trial court did not err in directing a verdict for Jones where the evidence was insufficient to present a fact question regarding the parties' intent.

Affirmed.