RICHARD GRINT ET AL., APPELLANTS, V. PAUL HART ET AL., APPELLEES.

343 N.W.2d 921

Filed February 3, 1984. No. 83-355.

Robert E. Wheeler of Stowell & Wheeler, P.C., for appellants.

Bernard B. Smith of Smith & Smith, for appellees.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

WHITE, J.

This is an action in equity to enjoin the defendants from obstructing a watercourse and for damages sustained by the plaintiffs. After trial on the issues the trial court inspected the premises and entered judgment for the defendants. We affirm.

Plaintiffs relied on two theories in the trial court. The first theory is that the waterflow across the lands involved constitutes a watercourse and, as such, defendants have no right to obstruct or repel the waterflow to the detriment of the plaintiffs. The second theory advanced by plaintiffs is that they have a prescriptive easement which allows them the right to drain the waters from their land onto the defendants' land.

Since this is an action in equity, we review the matter de novo without reference to the findings of fact made by the trial court, but where the testimony or evidence is in irreconcilable conflict, we take into consideration that the trial court observed the witnesses. We also take into consideration the fact that the trial court did view the premises, and we will give appropriate weight thereto. *Barry v. Wittmersehouse*, 212 Neb. 909, 327 N.W.2d 33 (1982).

The record reveals the following facts. Richard and Margaret Grint, plaintiffs-appellants, are the owners of the southeast quarter of Section 7, Township 19 North, Range 17 West, of the 6th P.M., in Custer County, Nebraska. Paul and Arlene Hart, defendants-appellees, own Section 17, Township 19 North, Range 17 West, of the 6th P.M., Custer County, Nebraska. The plaintiffs' property lies north of the defendants' property, and the general flow of drainage in this area is from northwest to southeast. There are approximately nine sections of land to the north and west of the land of the parties that drain in this direction. In its natural state water flows from the northwest, across the plaintiffs' land, and into a lagoon or swampy area on the southwest corner of the Sargent golf course. To the south of the lagoon a natural ridge exists on defendants' land, commencing at the northwest corner of their section and extending to the east and to the south. This ridge is from 9 to 11 feet above the golf course land and serves to prevent any water in the lagoon from flowing south onto the defendants' land.

At the time defendants acquired their land in 1954, there was an artificial V-shape cut in the ridge. In times of deluge this cut would serve to drain excessive water that assembled in the lagoon. It is uncontroverted that the water in question is surface water as defined by Nebraska law. See, *Kuta v. Flynn*, 182 Neb. 479, 155 N.W.2d 795 (1968); *Sullivan v. Hoffman*, 207 Neb. 166, 296 N.W.2d 707 (1980).

At trial Paul Hart testified that after heavy rains

in the spring of 1962, he constructed a dam in the cut to prevent any overflow water from the lagoon from draining onto his land. Both defendants testified that no water flowed through this cut from 1954 until 1962. The dam which defendants placed in the artificial cut remained intact until the spring of 1972 when a resident golfer and his friend, without the defendants' knowledge or permission, dug a small slit in the dam in order to alleviate the flooding on the golf course. The defendants discovered the small opening in 1974; however, they testified that to their knowledge no water flowed through the dam until the snowmelt in 1978. In the spring of that year Willard Hart, defendants' son, constructed a new dam to the north of the old one and close to the county road so that the defendants would know if the dam had been tampered with. Shortly thereafter, Harold Grint and others met with Paul Hart and asked him to remove the dam. Apparently relying on the group's representation that corrective action would be taken to alleviate the drainage problems in the area, the defendants removed the dam.

In August 1981, nothing having been done to remedy the drainage problem in the area, the defendants' son, during a period of unusually wet weather, again filled the cut. No water has flowed through the cut since.

Plaintiffs contend that in 1978, 1981, and 1982, when the cut was filled, it caused water to back up from the lagoon and flood a portion of their land. This flooding resulted in the inability to plant crops or the crops drowning in standing water.

Plaintiffs rely on *Pint v. Hahn*, 152 Neb. 127, 40 N.W.2d 328 (1949), for their proposition that the artificial cut made through the natural ridge created a watercourse in which the defendants have no right to dam or obstruct to the detriment of the plaintiffs. It is elementary that a party seeking an injunction must establish by competent evidence every controverted fact necessary to entitle him to relief. The

issue remains, then, as to whether a watercourse, natural or artificial, drained the surface water on the lands in question.

A watercourse is defined by statute as "[a]ny depression or draw two feet below the surrounding lands and having a continuous outlet to a stream of water, or river or brook shall be deemed a watercourse." Neb. Rev. Stat. § 31-202 (Reissue 1978).

" ' "To constitute a water course, it must appear that the water usually flows in a particular direction; and by a regular channel, having a bed with banks and sides; and (usually) discharging itself into some other body or stream of water. It may sometimes be dry. It need not flow continuously; but it must have a well defined and substantial existence. * * * there is a broad distinction between a stream and brook, constituting a water course, and occasional and temporary outbursts of water occasioned by unusual rains or the melting of snows, flowing over the entire face of a tract of land, and filling up low and marshy places, and running over adjoining lands, and into hollows and ravines which are in ordinary seasons destitute of water and dry." ' '" *Barry v. Wittmersehouse*, 212 Neb. 909, 912-13, 327 N.W.2d 33, 35 (1982).

In the instant case diffused waters were assembled in a low area. Any water that did flow through the artificial cut would spread out in a diffused state over the defendants' land and eventually, after filling the low areas, will flow into a natural watercourse located on defendants' land. This watercourse then flows into the Loup River.

In *Barry v. Wittmersehouse, supra* at 912, 327 N.W.2d at 35, we held that "[i]n order to constitute an exception to the general rule that surface water may be repelled, at least some of the distinctive attributes of a watercourse must be demonstrated."

We are convinced that no watercourse existed for the drainage of the surface water in question. In

truth, the effect of refilling the artificial cut was to keep this water flowing in its natural state.

There being no watercourse unlawfully blocked by the defendants, the question then becomes whether or not the plaintiffs have an easement which would force the defendants to maintain a cut in the ridge.

In the recent case of *Stricker v. Knaub*, 215 Neb. 372, 338 N.W.2d 757 (1983), we noted that prescriptive rights are not looked upon with favor and generally must be proved by clear, convincing, and satisfactory evidence. We further held that " '[a] claimed easement must be viewed from both ends of the prescriptive period. The nature and extent or scope of the user must from the beginning be clearly established. At the end of the period it must appear in retrospect that there has been no material change or variance from the limits or course adopted or established at the beginning. A lesser user prevents a right to an easement and a greater user is of no importance until the full prescriptive period has elapsed from the initiation of the greater use. The law requires that the easement must be clearly definable and precisely measured.' " *Id.* at 377-78, 338 N.W.2d at 761.

Even if we were to hold that the plaintiffs did meet the burden of proving a prescriptive easement, the record reveals that any such easement has long been abandoned.

Although the year is in dispute, there was evidence adduced at trial that the artificial cut was filled by Paul Hart in 1962. William Skolil, plaintiffs' predecessor in interest, knew that Paul Hart filled the cut. He did not complain. No water flowed through the cut, to the knowledge or damage of the defendants, until the snowmelt in the spring of 1978. Except for the small slit made by the golfers in 1972 and the conditional reopening in 1978, the artificial cut was effectively filled from 1962 to the present. We find that the defendants have effectively pled and proved abandonment of any ease-

ment that the plaintiffs may have enjoyed. See, *Whipple v. Nelson*, 143 Neb. 286, 9 N.W.2d 288 (1943); *Lackaff v. Bogue*, 158 Neb. 174, 62 N.W.2d 889 (1954).

It is clear from the record that much of the land in this general area is burdened by water drainage problems which increase in severity yearly. The record also conclusively shows that the plaintiffs have been damaged as a result of the defendants re-filling the artificial cut in the ridge. We fail to see, however, how it can be said that the plaintiffs have any remedy, legal or equitable, against the defendants.

AFFIRMED.