RICHARD SHOTKOSKI, APPELLEE, V. THEODORE PROSOSKI, APPELLANT.

362 N.W.2d 59

Filed February 8, 1985.   No. 83-841.

John Morgan of Morgan & Morgan, for appellant.

Donald R. Treadway of Treadway, Bird & Albin, P.C., for appellee.

KRIVOSHA, C.J., HASTINGS, CAPORALE, and SHANAHAN, JJ., and BRODKEY, J., Retired.

HASTINGS, J.

The defendant, who has a contractual interest in and is in possession of the southeast quarter of Section 14, Township 16 North, Range 5 West of the 6th P.M., Nance County, Nebraska, has appealed an order of the district court which enjoined him from obstructing the flow of water through a drainageway across that property.

He assigns as error that the trial court incorrectly determined that the drainageway mentioned in fact existed and that the court failed to find that the statute of limitations barred the action. However, he failed to argue the statute of limitations issue either in his brief or during oral argument and, in fact, stated in open court that he was abandoning such assignment. Therefore, we need not consider it.

This action was originally brought by four different landowners owning land to the west and north of the defendant's property, all of whom claimed that the action of the defendant in blocking this drainageway caused runoff waters to back up and pond on their property, to their damage. However, the district court found that no damage occurred as to any of the plaintiffs excepting Richard Shotkoski, and he is the only other party to this appeal.

The plaintiff Richard Shotkoski owns the east half of the southwest quarter of this same section, and of course his eastern boundary is the same line that constitutes the defendant's western boundary.

Several witnesses testified, including Ronald Rystrom, a professional engineer and land surveyor, and a number of detailed exhibits were received in evidence, including photographs, aerial photo maps, and contour and soil maps. However, it cannot be left unsaid that the manner in which the witnesses were allowed to testify made many of these exhibits

practically unintelligible and useless for the purpose of our review. For example, when asked where the break in the so-called dike appeared, the witness answered, "It's in this area right here," and when quizzed as to the lowest elevation in the quarter section, the reply was "Right in this area right here."

Of particular note is exhibit 51, a U.S. Soil Conservation Service detailed contour map, which could have been of immeasurable help in deciding this case. However, the testimony of the witness Rystrom, when asked to locate the breach in the fence line, stated, "It's in this area right here." When inquiry was made of him as to whether there appeared to be a lower area clear across the quarter section, he replied, "Yes . . . it shows it is in this area here and back over." It should be readily apparent to counsel and the trial court that this court, reviewing only the record, has no idea where the witnesses were pointing when making these observations.

Be that as it may, we will attempt to set forth the pertinent facts as accurately as the record will permit. There is a three-strand barbed wire fence which runs along the common border between the plaintiff's and the defendant's land. Sometime in April of 1983, a rainstorm of unspecified proportions caused water to pond and back up to the west from the fence line. Eventually, a washout occurred in a portion of the area between two fenceposts, allowing the ponded water to run as a stream from the plaintiff's property onto and across the defendant's field. It is obvious from the photographs in evidence that this created a gully of some depth across a portion of the defendant's land.

Although the photographs, the testimony of engineer Rystrom, and an elevation drawing prepared by him would demonstrate that the fence line itself ranges from a foot to a foot and a half higher than the natural ground level immediately to the west, the defendant denies that the fence line was a constructed dike or even a natural buildup caused by blowing dirt and debris. He insists that the fence line has been in existence for 50 to 60 years without change and that land leveling done by owners to the west, including the plaintiff, has placed water into the area immediately west of his fence line

that was not there before.

Defendant does concede that before this court action was instituted he planned to fill in this breach and the gullies in order to allow movement of his trucks and machinery. As a matter of fact, the record of a subsequent contempt hearing, which is included with the bill of exceptions, demonstrates that the defendant did in fact fill in this gully and inserted a tube or culvert to allow whatever water was wont to flow to proceed to the east. Defendant denies that this was ever a natural watercourse. Another witness, Mary Koza, testified that she and her husband had farmed in this area starting in 1927 and there had never been any water running through the area of the breach.

Lucion Shotkoski, a brother of the plaintiff, testified that in 1948 or 1949 he observed dirt-moving equipment "moving north and south on the west boundary of the Southeast Quarter 14-16-5, moving dirt to the area of the depression."

Dennis Shotkoski, another brother of the plaintiff, testified that he owned and had farmed land immediately west and north of plaintiff's property since 1945, and had lived and farmed in the area for some years prior to that time. In answer to a question as to how the water flowed in that area, he stated:

A. It comes here west to my brother's house — Richard — and goes north and cuts across here, and it goes on down through the depression.

. . . .

Q. [By Mr. Treadway] Well, it comes out of the southwest, goes into the southeast, and then moves out of the Southeast Quarter onto some other land?

. . . .

A. Well . . . and it comes through the field, goes through the depression in the Prososki land at the fence line, and goes through his land and goes out through Prososki's and on down to the east.

This witness went on to explain how the water flowed across the plaintiff's land, through the break in the fence line, and on across the defendant's property through culverts located on the east side of defendant's land. According to his testimony, the water flowed in this manner in the years previous to 1983 and as

far back as 1948 or 1949. However, he also agreed that many years ago his father had placed a dike on the fence line between some property now owned by Ronald Shotkoski and a piece of land owned by Richard Shotkoski, apparently along the boundary line between the southeast and southwest quarters of Section 15. Richard Shotkoski testified that *for the first time in his memory*, the water had broken over this dike in the spring of 1983. This allowed a considerable amount of water to flow toward the east from this quarter and onto Section 14.

The testimony of Ronald Rystrom, the engineer, particularly as it related to a drawing of profiles or elevations which he had run, exhibit 52, and a comprehensive map prepared by the U.S. Geological Survey, Department of the Interior, exhibit 49, is particularly instructive.

The profile drawings disclose what he describes as a depression, commencing with elevations of 1,612.9 feet at a point 415 feet west of the fence line, to 1,612.8, at a point 20 feet west of the fence, then a jump to 1,613.6 at the fence line, disregarding the breach, and then on down to 1,604.4 feet 300 feet east of the fence line. However, the profile drawing also shows a marked rise in elevation at the fence line, which Rystrom explains as being from a foot to a foot and a half higher than the natural ground level immediately to the west of the fence. Removing the buildup from the fence line would bring that elevation down lower than the 1,612.8 feet immediately west of that line.

Perhaps what the trial court may have felt was most persuasive of the various exhibits was the U.S. Geological Survey map, which shows scattered elevations and stream lines. The blue "dash-dotted" lines, according to Rystrom, represent flow lines or streambeds.

Although, incredibly, no witness was ever asked to locate either by measurements or markings on a map the north-south location of the breach in the fence line, there does very definitely appear on the USGS map a blue line originating toward the northern end of the center of the southwest corner which crosses into the southeast quarter at a point approximately 1,000 feet north of the south boundary line. This line then meanders across the southeast quarter section,

through Section 13 and down into Section 24, where it enlarges into what appear to be two lakes or ponds. The line then continues for approximately another 4 miles, enlarging into a rather obvious, well-defined stream, which finally empties into Prairie Creek.

Examination of a series of aerial photo maps, appearing as exhibits 47 and 48, even more graphically reveals the flow line, particularly in the southeast quarter of the southeast quarter, where a well-defined pond appears on an aerial photo being a part of exhibit 47.

Rystrom also relied on exhibit 50, a comprehensive soil survey of Nance County prepared by the U.S. Department of Agriculture, Soil Conservation Service. This also shows the "dash-dotted" line which the witness declared was a drainageway. However, the source or beginning of this line is within approximately 400 feet of the east boundary of the southeast corner. This in turn would show its origin as some 900 feet east of the fence line and breach under consideration. Additionally, exhibit 47, an overhead aerial photo, shows a well-defined drainageway which does not originate until some point well into the southeast quarter of the southeast quarter, again, at least a quarter of a mile east of the controversial fence line.

Also appearing in the record are a series of aerial photos taken by a spray-plane pilot on June 14, 1983. Exhibits 30 and 31 are supposed to depict the area of defendant's land where the water passes under the road and on to the east to Section 13. Something remarkable about those photos is that they show intermittent ponds of water scattered throughout both Sections 14 and 13. Additionally, the water, which would appear as a stream consistent with the exhibits previously mentioned, would seem to commence at a point within perhaps 400 feet or so of the east line of Section 14.

Exhibits 32 and 33 are said to disclose water flowing or ponding up on the extreme east side of defendant's land. Additionally, they would show innumerable patches of standing water east, south, and north of the area in question, onto other sections.

Shown on exhibits 34 and 35 is the fence line and breach, with

water ponding on the defendant's side of the fence, and what appears to be thoroughly soaked cropland on the plaintiff's side, but no standing water. Exhibits 36 and 37 supposedly show the break in the fence line, with water flowing from the west to the east. Again, there appear to be any number of isolated ponds of water standing without reference to any drainageway.

Dennis Shotkoski described exhibit 39, showing water ponded all over a large portion of his 80 acres lying west of the plaintiff's. He says this shows the break in the township road to the west, with water ponded up on the west side.

This same witness went on to describe exhibits 42, 43, 44, and 45 as showing water going onto his brother Richard's farm, over the township road; water coming from Ronald Shotkoski's farm, on farther east onto Richard's farm, and onto the witness' farm; and also water ponding in many areas of what he calls his brother's farm, although without reference to which farm.

The testimony established generally that "dikes," or built-up fence rows, had been in existence in this area for a number of years. Also, land had been leveled, apparently diverting the natural flow from one direction to another, and several culverts existed to carry surface waters to natural drainageways. Some of these culverts had become blocked, which may in part have been the cause for the alteration of waterflow.

The great number of areas of ponded water disclosed by the various photographs, together with this testimony, would seem to substantiate the fact that most of the farmers in this area had been taking steps to protect their land from spreading surface water.

An examination of the many photographs, particularly exhibits 1, 2, 3, 4, 5, and 7, as well as the other evidence set forth above, does not convince us that there is any "waterway," or "drainageway," as previously defined by this court, existing at or west of the fence line in question, other than the short gully created at the fence line by the receding waters.

The general rule is that

> diffused surface waters may be dammed, diverted, or otherwise repelled, if necessary, and in the absence of negligence. But when diffused surface waters are

concentrated in volume and velocity and flow into a natural depression, draw, swale, or other drainway, the rule as to diffused surface waters does not apply.

*Nichol v. Yocum*, 173 Neb. 298, 306, 113 N.W.2d 195, 200 (1962). See, also, *Hiegel Farms Corp. v. Casselman*, 217 Neb. 506, 349 N.W.2d 382 (1984); *Krafka v. Brase*, 218 Neb. 335, 353 N.W.2d 276 (1984).

"In Nebraska surface water is defined as water which appears upon the surface of the ground in a diffused state, with no permanent source of supply or regular course, which ordinarily results from rainfall or melting snow." *LaPuzza v. Sedlacek*, 218 Neb. 285, 286-87, 353 N.W.2d 17, 18 (1984).

In the instant case it appears, to say the least, that the waters traversing through the fence line never lost their character as surface water.

In *Barry v. Wittmersehouse*, 212 Neb. 909, 912, 327 N.W.2d 33, 35 (1982), this court stated: "In order to constitute an exception to the general rule that surface water may be repelled, at least some of the distinctive attributes of a watercourse must be demonstrated."

Neb. Rev. Stat. § 31-202 (Reissue 1984) provides: "Any depression or draw two feet below the surrounding lands and having a continuous outlet to a stream of water, or river or brook shall be deemed a watercourse."

Case law has further refined the requirements for the existence of a watercourse.

" ' "To constitute a water course, it must appear that the water usually flows in a particular direction; and by a regular channel, having a bed with banks and sides; and (usually) discharging itself into some other body or stream of water. It may sometimes be dry. It need not flow continuously; but it must have a well defined and substantial existence. * * * there is a broad distinction between a stream and brook, constituting a water course, and occasional and temporary outbursts of water occasioned by unusual rains or the melting of snows, flowing over the entire face of a tract of land, and filling up low and marshy places, and running over adjoining lands, and into hollows and ravines which are in ordinary

seasons destitute of water and dry." ' "
*Grint v. Hart*, 216 Neb. 406, 410, 343 N.W.2d 921, 924 (1984).
*Barry v. Wittmersehouse, supra; Mader v. Mettenbrink*, 159
Neb. 118, 65 N.W.2d 334 (1954). Evidence adduced at trial
appears to support a finding of an "occasional and temporary
outburst of water," as contemplated by the *Grint* opinion.

The evidence, in our view, and we must review this case de
novo on the record, does not establish at the site of the wash
through, other than on this one occasion, anything
approaching a regular channel with a bed, banks, and sides.
Rather, the record does support a conclusion that this was only
an "occasional and temporary outburst of water" as
contemplated by the *Grint* decision.

We are well aware of the fact that regardless of the
requirements of § 31-202, the flow of surface water in any
well-defined course, whether it be a ditch, swale, or draw in its
primitive condition and whether it is 2 feet deep or not, may
qualify as a watercourse or drainageway with which a
landowner may not interfere to the detriment of his neighbor.
*Barry v. Wittmersehouse, supra*. But as that same case goes on
to say at 913, 327 N.W.2d at 35-36:

> In the instant case the de novo review of the record
> shows that occasionally surface water, caused by heavy
> rains or snows, collected in the low areas on the plaintiffs'
> land and flowed toward the defendants' land. When the
> overflow would reach the defendants' land, it would
> spread out and fill up the low area thereon. We do not
> think the overflow from these low areas ever reached the
> stage where it could be called a watercourse rather than
> merely diffused surface water.
>
> Surface water is a common enemy and the proprietor
> may by enbankment [sic] or dike or otherwise defend
> himself against its encroachment, and he will not be liable
> in damages . . . provided that the proprietor in making
> defense on his own land himself exercises ordinary care . .
> . .

And in *Grint v. Hart, supra* at 410-11, 343 N.W.2d at 924, we
went on to say:

> In the instant case diffused waters were assembled in a

low area. Any water that did flow through the artificial cut would spread out in a diffused state over the defendants' land and eventually, after filling the low areas, will flow into a natural watercourse located on defendants' land. This watercourse then flows into the Loup River.

. . . .

We are convinced that no watercourse existed for the drainage of the surface water in question. In truth, the effect of refilling the artificial cut was to keep this water flowing in its natural state.

The plaintiff has failed to prove that a natural depression, draw, swale, or drainageway existed on these premises.

The facts in this case are not all that different from those found in *Hiegel Farms Corp. v. Casselman*, 217 Neb. 506, 349 N.W.2d 382 (1984). The plaintiff has failed to establish by competent evidence every fact necessary to entitle him to injunctive relief. *Cather & Sons Constr., Inc. v. City of Lincoln*, 200 Neb. 510, 264 N.W.2d 413 (1978). Therefore, the judgment of the district court is reversed and plaintiff's petition is ordered dismissed.

REVERSED AND REMANDED WITH
DIRECTIONS TO DISMISS.