B. Where two inferences may be drawn from the facts proved, which inferences are opposed to each other but are equally consistent with the facts proved, a party having the burden of proof on an issue may not meet that burden by relying solely on the inference favoring that party.

Instruction No. 7 is a correct statement of the law. See, NJI2d Civ. 2.12A; NJI2d Civ. 16.06. Because the question raised by the jury was adequately covered by the instruction given, the district court did not abuse its discretion by referring the jury to the instructions and declining further explanation.

## CONCLUSION

We find no error in the district court's decisions and therefore affirm the judgment.

AFFIRMED.

---

ALAN FYFE, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF BILLIE FYFE, AND DAVID WINGENBACH, APPELLEES, v. TABOR TURNPOST, L.L.C., A NEBRASKA LIMITED LIABILITY COMPANY, ET AL., APPELLANTS.

___ N.W.2d ___

Filed February 3, 2015.   No. A-13-907.

1. **Easements: Adverse Possession: Equity: Jurisdiction: Appeal and Error.** A suit to confirm a prescriptive easement is one grounded in the equitable jurisdiction of the district court. An appellate court's review is de novo on the record, subject to the rule that where credible evidence is in conflict on material issues of fact, an appellate court will consider that the trial court observed the witnesses and accepted one version of the facts over another.
2. **Rules of Evidence.** In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.
3. **Jury Instructions: Appeal and Error.** Whether a jury instruction is correct is a question of law, which an appellate court independently decides.
4. **Easements: Proof: Time.** A party claiming a prescriptive easement must show that its use was exclusive, adverse, under a claim of right, continuous and uninterrupted, and open and notorious for the full 10-year prescriptive period.

5. **Easements: Adverse Possession.** The use and enjoyment which will give title by prescription to an easement are substantially the same in quality and characteristics as the adverse possession which will give title to real estate.

6. ____: ____. The law treats a claim of a prescriptive right with disfavor, and, accordingly, such a claim requires that all the elements of such adverse use be clearly, convincingly, and satisfactorily established.

7. **Easements: Presumptions: Proof: Time.** Generally, once a claimant has shown open and notorious use over the 10-year prescriptive period, adverseness is presumed. At that point, the landowner must present evidence showing that the use was permissive.

8. **Easements: Proof.** The party asserting a prescriptive right must also clearly establish the nature and scope of the easement.

9. **Easements.** The extent and nature of an easement are determined from the use made of the property during the prescriptive period.

10. ____. The law requires that an easement must be clearly definable and precisely measured.

11. **Easements: Adverse Possession: Words and Phrases.** A use is continuous and uninterrupted if it is established that the easement was used whenever there was any necessity to do so and with such frequency that the owner of the servient estate would have been apprised of the right being claimed.

12. **Easements.** A permissive use is not adverse and cannot ripen into a prescriptive easement.

13. **Easements: Adverse Possession: Notice.** If a use begins as a permissive one, it retains that character until notice that the use is claimed as a matter of right is communicated to the owner of the servient estate.

14. **Easements.** An easement carries with it, by implication, the right of doing whatever is reasonably necessary for the full enjoyment of the easement itself.

15. **Injunction: Equity.** A mandatory injunction is an equitable remedy that commands the subject of the order to perform an affirmative act to undo a wrongful act or injury.

16. **Injunction.** An injunction, in general, is an extraordinary remedy that a court should ordinarily not grant except in a clear case where there is actual and substantial injury.

17. **Injunction: Damages.** A court should not grant an injunction unless the right is clear, the damage is irreparable, and the remedy at law is inadequate to prevent a failure of justice.

18. **Injunction: Equity.** Where an injury committed by one against another is continuous or is being constantly repeated, so that complainant's remedy at law requires the bringing of successive actions, that remedy is inadequate and the injury will be prevented by injunction.

19. **Equity: Words and Phrases.** An adequate remedy at law means a remedy which is plain and complete and as practical and efficient to the ends of justice and its prompt administration as the remedy in equity.

20. **Trial: Evidence: Appeal and Error.** Error may not be predicated upon a ruling admitting or excluding evidence unless a substantial right of the party is affected and, in cases where the ruling is one excluding evidence, the substance of the

evidence was made known to the judge by offer or was apparent from the context within which questions were asked.

21. **Trial: Witnesses: Records.** In order to predicate error upon a ruling of the court refusing to permit a witness to testify, or to answer a specific question, the record must show an offer to prove the facts sought to be elicited.

22. **Easements: Equity.** An adjudication of rights with respect to an easement is an equitable action.

Appeal from the District Court for Scotts Bluff County: Randall L. Lippstreu, Judge. Affirmed.

Bell Island, of Island, Huff & Nichols, P.C., L.L.O., for appellants.

Jerald L. Ostdiek, of Douglas, Kelly, Ostdiek & Ossian, P.C., and Howard P. Olsen, Jr., and John F. Simmons, of Simmons Olsen Law Firm, P.C., for appellees.

Moore, Chief Judge, and Riedmann and Bishop, Judges.

Moore, Chief Judge.

In this appeal, we review a prescriptive easement for an irrigation lateral granted by the district court to Alan Fyfe and Billie Fyfe over a part of real estate owned by Tabor Turnpost, L.L.C., an entity composed of Thomas W. Baker and Juanita Baker and their two daughters. The Fyfes were also awarded damages following a jury trial. The Bakers assign a number of errors which relate to the court's grant of the prescriptive easement and an injunction, the exclusion of certain testimony at trial, and the court's jury instructions. We find no merit to the Bakers' arguments and affirm the trial court's judgment.

## I. FACTUAL BACKGROUND

In 1896, the Minatare Mutual Canal and Irrigation Company (Minatare Mutual) was incorporated as a nonprofit corporation under Nebraska law. Minatare Mutual's stated purpose is to deliver water to the stockholders of the company. The company's canal begins just east of Scottsbluff, Nebraska, behind the city's lagoon, and flows in a general southerly direction through Minatare, Nebraska, before eventually emptying into

the North Platte River. Minatare Mutual delivers water to its stockholders through a series of headgates located at various points along the canal. If more than one landowner receives water through a particular headgate, Minatare Mutual delivers water to the headgate, but the landowners are responsible to work out how each would receive the water.

The disputing parties in this action are neighboring landowners and stockholders in Minatare Mutual. Since 1953, the Fyfe family has owned real property which is legally described as "[t]he Northeast Quarter and the North Twenty acres of the Southeast Quarter of Section 21, Township 21 North, Range 53 West of the 6th P.M., Scotts Bluff County, Nebraska . . . ." At the time this action was instituted, Alan Fyfe and his father, Billie Fyfe, were co-owners of this property. Billie Fyfe died during the pendency of the action, and Alan Fyfe, as personal representative of his father's estate, maintained the action. Although Billie Fyfe originally farmed the land, the Fyfes have leased their property for approximately the past 15 years. Since approximately 2008, the Fyfes have been leasing their property to David Wingenbach, who was also a named plaintiff. For the convenience of the reader, the plaintiffs in this action will be collectively referred to hereafter as "the Fyfes."

The Bakers have owned and farmed property to the northwest of the Fyfes since 1974. Their property is legally described as "[t]he West Half (W½) of Section Sixteen (16), Township Twenty-one (21) North, Range Fifty-three (53) West of the 6th P.M., Scotts Bluff County, Nebraska." In 1998, the Bakers transferred the ownership of their land to Tabor Turnpost, an entity which is composed of the Bakers and their two daughters. For the remainder of the opinion, we collectively refer to Tabor Turnpost and the Bakers as "the Bakers."

The focus of the Fyfes and the Bakers' dispute is a lateral that begins at headgate 39 on the Minatare Mutual canal which is located on the western edge of the Baker property and runs across the Baker property. Specifically, the lateral runs west to east from headgate 39 until it reaches an elbow. At the elbow, the lateral continues southeast until it reaches the northwest corner of the Fyfe property. Included with this

opinion as appendix A is a portion of exhibit 166—a drawing of the lateral and the surrounding area—which was received into evidence at trial. Although neither party was aware when the lateral was originally constructed, Alan Fyfe testified that his family had used the lateral to bring water from Minatare Mutual's canal to irrigate the Fyfe property since 1953. The Bakers acknowledged that the lateral was in existence when they purchased the property in 1974. There was also testimony that four landowners utilized the lateral for irrigation until approximately 2000. Since 2000, only the Fyfes and the Bakers have used the lateral to receive water from Minatare Mutual.

Maintenance of this lateral has been a contentious issue between the parties. The Bakers have maintained the lateral from headgate 39 to a cement "check" that was located just beyond the elbow, while the Fyfes have maintained the lateral from that check to the point where the lateral reached their property. A check is a structure, often built of cement, which is used to impede the flow of water so it will rise up and flow in a different direction. The parties generally agree on the various methods that can be employed to clean the lateral, which include burning the dried weeds in the lateral in the early spring before water enters the lateral, spraying weedkiller on the sides of the lateral, and using mechanical means to scrape all the weeds from the lateral. The Bakers contend that the Fyfes have not adequately performed the required maintenance, causing the lateral to overflow onto the Baker property on various occasions. Over the years, the Bakers complained to the Minatare Mutual board a number of times regarding the Fyfes' maintenance of the lateral.

The Fyfes deny that their maintenance of the lateral has been inadequate. Their maintenance has included a yearly burning of the dried weeds in the lateral as well as using mechanical means in certain years to scrape weed growth from the lateral. The Fyfes also claim that they have always been able to receive water through the lateral despite any weed issues. Past and present representatives from Minatare Mutual testified that the Fyfes have never been denied water because of weeds.

In 2007, the Bakers installed four culverts on the lateral. These culverts are located just past the elbow and were installed in place of an old cement check. The Bakers utilize two of these culverts to divert water from the lateral to irrigate their fields on either side of the lateral. The other two culverts allow water to flow through the lateral. The Fyfes asserted at trial that the culverts restrict the flow of water through the lateral to the point where they no longer receive enough water to irrigate their fields.

The parties' dispute reached its boiling point in July 2010, when the Bakers shut down the headgate after the Fyfes had called Minatare Mutual for water. Thomas Baker claimed that water was running over onto his property and that he had received permission from Minatare Mutual to lower the headgate whenever overflowing occurred. The Fyfes did not become aware of the existence of this purported agreement between the Bakers and Minatare Mutual until they filed suit against the Bakers. The Fyfes did not receive any water from Minatare Mutual for the rest of 2010.

To prevent the previous year's problems from repeating, the Fyfes obtained permission from Minatare Mutual in 2011 to utilize a more northern headgate on the canal as their diversion point, and they now receive water through a different series of laterals. The Fyfes installed a center pivot on their property and have been able to irrigate the majority of their property through this new system. However, even with this new system, the Fyfes could not supply water to all of their property, and they filed suit against the Bakers in the district court.

The Fyfes filed their operative complaint on March 1, 2012. They sought relief in the form of a prescriptive easement over the Baker property to obtain irrigation water, an injunction to prevent the Bakers from interfering with their easement, and damages resulting from crop losses. The Bakers denied the Fyfes' allegations and counterclaimed, seeking to eject the Fyfes from their property and to be compensated for damages to their property. On July 23 and 24, the district court held a trial on the equitable issues.

On October 3, 2012, the district court entered a memorandum order in which it granted the Fyfes a perpetual prescriptive easement. After including the legal descriptions of the parties' property, the court described the prescriptive easement as follows:

> This easement shall start at Minatare Mutual . . . headgate #39 located on [Minatare Mutual's] main canal and end at the southeast corner of [the Baker property]/northwest corner of [the Fyfe property]. The easement shall follow a well defined irrigation lateral across [the Baker property] that has been in existence for more than fifty years. This irrigation lateral runs generally from west to east from headgate #39 to a well defined check box or "elbow" and then generally southeastwardly to the southeast corner of [the Baker property]. The extent of the easement is 10 feet on each side of the center line of the irrigation lateral between headgate #39 and the "elbow;" and 20 feet on each side of the center line of the irrigation lateral between the [elbow] and the southeast corner of [the Baker property].

In addition to granting the Fyfes a prescriptive easement, the district court also granted the Fyfes' requested injunctive relief and enjoined the Bakers from interfering with the Fyfes' reasonable operation, use, and maintenance of the prescriptive easement. The court found that the culverts the Bakers installed in 2007 unreasonably interfered with the Fyfes' prescriptive easement and ordered their removal. The order permitted the Bakers, at their option, to reinstall a cement check at that point on the lateral. Finally, the court denied the Bakers' counterclaim for ejectment.

On September 23 through 25, 2013, the district court held a jury trial on the issue of damages. The jury found in favor of the Fyfes and awarded $19,200 in damages. The jury also found against the Bakers on their counterclaim. The Bakers have appealed.

## II. ASSIGNMENTS OF ERROR

The Bakers assert that the district court erred when it (1) granted the Fyfes a prescriptive easement, (2) granted the

Fyfes injunctive relief which required the Bakers to remove certain culverts, (3) excluded certain statements made by Billie Fyfe as hearsay, and (4) instructed the jury that the installation of culverts had unreasonably interfered with the Fyfes' water.

## III. STANDARD OF REVIEW

[1] A suit to confirm a prescriptive easement is one grounded in the equitable jurisdiction of the district court. An appellate court's review is de novo on the record, subject to the rule that where credible evidence is in conflict on material issues of fact, an appellate court will consider that the trial court observed the witnesses and accepted one version of the facts over another. See *Teadtke v. Havranek*, 279 Neb. 284, 777 N.W.2d 810 (2010).

[2] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *Hike v. State*, 288 Neb. 60, 846 N.W.2d 205 (2014).

[3] Whether a jury instruction is correct is a question of law, which an appellate court independently decides. *Kuhnel v. BNSF Railway Co.*, 287 Neb. 541, 844 N.W.2d 251 (2014).

## IV. ANALYSIS

### 1. PRESCRIPTIVE EASEMENT

[4-6] A party claiming a prescriptive easement must show that its use was exclusive, adverse, under a claim of right, continuous and uninterrupted, and open and notorious for the full 10-year prescriptive period. *Feloney v. Baye*, 283 Neb. 972, 815 N.W.2d 160 (2012). Although there are some differences between the two doctrines, the use and enjoyment which will give title by prescription to an easement are substantially the same in quality and characteristics as the adverse possession which will give title to real estate. See *Teadtke v. Havranek, supra*. The law treats a claim of a prescriptive right with disfavor, and, accordingly, such a claim requires that all the elements of such adverse use be clearly, convincingly, and

satisfactorily established. *Lake Arrowhead, Inc. v. Jolliffe*, 263 Neb. 354, 639 N.W.2d 905 (2002).

[7] Generally, once a claimant has shown open and notorious use over the 10-year prescriptive period, adverseness is presumed. *Feloney v. Baye, supra*. At that point, the landowner must present evidence showing that the use was permissive. *Id*.

[8-10] In addition to satisfying the necessary requirements to establish a prescriptive easement, the party asserting a prescriptive right must also clearly establish the nature and scope of the easement. See *Werner v. Schardt*, 222 Neb. 186, 382 N.W.2d 357 (1986). The extent and nature of an easement are determined from the use made of the property during the prescriptive period. *Teadtke v. Havranek, supra*. The law requires that the easement must be clearly definable and precisely measured. *Grint v. Hart*, 216 Neb. 406, 343 N.W.2d 921 (1984).

The Bakers assert that the district court erred when it granted the Fyfes a prescriptive easement. They contend that the Fyfes' use was not continuous and that the Fyfes' entry onto the Baker property was obtained by permission. The Bakers also argue that the prescriptive easement granted by the district court was not precisely described and was in excess of the Fyfes' actual use. We separately address each of these arguments.

### (a) Continuous

The Bakers assert that the Fyfes' claim for a prescriptive easement must fail because the Fyfes have submitted to limitations on their use of the lateral. The Bakers assert that Minatare Mutual's limitations, as well as their own, have interrupted the Fyfes' use of the easement. We disagree.

[11] A use is continuous and uninterrupted if it is established that the easement was used whenever there was any necessity to do so and with such frequency that the owner of the servient estate would have been apprised of the right being claimed. *Svoboda v. Johnson*, 204 Neb. 57, 281 N.W.2d 892 (1979); *Breiner v. Holt Cty.*, 7 Neb. App. 132, 581 N.W.2d 89 (1998).

There is no dispute that the Fyfes have utilized the lateral to obtain water to irrigate their property for far longer than the necessary 10-year prescriptive period. The fact that Minatare Mutual has the ability to deny water to any stockholder if a lateral is not properly cleared of weeds is not significant. Although there was evidence that the Fyfes received notices from Minatare Mutual that their water would be shut off if the lateral was not cleaned, there was no evidence that anyone associated with Minatare Mutual had ever shut off the Fyfes' water. Further, even though Minatare Mutual had the right to deny the Fyfes water, this had no effect on the Fyfes' claim to use the lateral across the Baker property.

There is evidence in the record that the Bakers at various times restricted the Fyfes' access to the lateral, which has frustrated the Fyfes' ability to perform maintenance. The Bakers would not allow the Fyfes onto their land if crops had been planted, or the Fyfes were forced to access the lateral in between alfalfa cuttings. Even with these restrictions, however, the Fyfes' use of the lateral was continuous. The Bakers never asserted that the Fyfes could not utilize the lateral to obtain water; rather, the Bakers' restrictions related to the Fyfes' accessing the lateral via the Bakers' surrounding land. Finally, the fact that the Bakers interrupted the Fyfes' receipt of water through the lateral in June 2010 does not defeat their continuous use of the lateral, particularly since their use of the lateral began in 1953 and continued uninterrupted until at least 2010.

While the Fyfes' receipt of water and maintenance of the lateral varied and was not a daily occurrence, such is not necessary to establish their continuous use of the lateral. The Fyfes established that their use of the lateral was continuous throughout the prescriptive period.

### (b) Permissive

At trial, the Bakers asserted that the Fyfes' use of the lateral was established by an agreement with the previous landowners. The Bakers did not produce direct evidence of the agreement, but they testified that they were informed of the existence of the agreement prior to their purchase of the

property. The Bakers also highlighted the Minatare Mutual rules to further their claim that the Fyfes' use of the lateral was permissive.

[12,13] It is well established that a permissive use is not adverse and cannot ripen into a prescriptive easement. See *Simacek v. York County Rural P.P. Dist.*, 220 Neb. 484, 370 N.W.2d 709 (1985). The general rule is that if a use begins as a permissive one, it retains that character until notice that the use is claimed as a matter of right is communicated to the owner of the servient estate. *Id*.

Although the Bakers claim that the Fyfes' use of the lateral was permissive, there is little evidence in the record to support that claim. First, there was no evidence, other than the Bakers' testimony, of any agreement between the Bakers' predecessors that permitted the Fyfes to use the lateral. Based on our reading of the record, we agree with the district court's characterization of the Bakers' testimony regarding the agreement as having been for the "convenience of litigation."

The Bakers also contended that the Minatare Mutual bylaws lend support to their claim that the Fyfes' use of the lateral was permissive. Specifically, the Bakers highlight the following provisions: "Any turnouts used by one or more shareholders shall share the cost of headgate and installation as per share basis and be used by each of them. . . . No headgate will be allowed until a permit has been issued by Minatare Mutual." Because joint shareholders used headgate 39, the Bakers contend, it logically follows that the Fyfes' use of the lateral had to be permissive. However, these provisions in the bylaws do not have the force that the Bakers assert. The above provisions in the bylaws state that in order to establish a joint headgate, the shareholders must share the cost and obtain Minatare Mutual's permission. Nonetheless, these provisions do not establish that the Fyfes' use of this particular lateral over the Baker property was by permission. The record is silent as to whether the headgate was originally a joint headgate or whether it was used first by a single landowner and later by multiple landowners.

Additionally, we note that the evidence at trial established that the Fyfes have used this lateral to irrigate their land since

at least 1959, as recited by the trial court. Thus, based on this record, we agree with the trial court's conclusion that the prescriptive period began in 1959 at the latest. That being the case, and there being no evidence to refute the Fyfes' claim, the Fyfes' prescriptive right to use the lateral existed before the Bakers purchased their property.

Finally, we observe that the Bakers' actions throughout their ownership of the property establish that they did not believe the Fyfes' use was permissive. If use of the lateral was by permission, the Bakers could have required the Fyfes to obtain their irrigation water through another route many years earlier. However, the Bakers never objected to the Fyfes' ability to obtain water through the lateral. In fact, the Fyfes' entitlement to receive the water that was delivered to the headgate and through the lateral derived from Minatare Mutual, not the Bakers or their predecessors. Further, if access to the lateral for maintenance was by permission of the Bakers, they would not have prohibited the Fyfes from entering the Baker property at various times to maintain the lateral. Instead, the Bakers submitted numerous complaints to the Minatare Mutual board regarding the Fyfes' maintenance, or lack of maintenance, of the lateral and eventually lowered the headgate to prevent the Bakers from receiving water. Only when this litigation was initiated did the Bakers seek to eject the Fyfes from the land.

We conclude the record clearly shows that the Fyfes' use of the lateral to obtain water was not permissive.

### (c) Description and Scope
### of Easement

The Bakers assert that the Fyfes' claim for a prescriptive easement must also fail for lack of an exact description. They claim that the district court's description of the easement is speculative because there are no measurements, locations, or other fixed landmarks from which to establish the boundary line. The Bakers assert that there must be a metes and bounds description of the easement.

As noted above, the district court granted the Fyfes a prescriptive easement over the irrigation lateral. The court

determined there was sufficient evidence to show the location of the lateral and noted that its location had not been a contested issue. The court also determined that the scope of the easement extended 10 feet on each side of the irrigation lateral between headgate 39 and the elbow and 20 feet on each side of the irrigation lateral between the elbow and the southeast corner of the Baker property.

We reject the Bakers' argument that the Fyfes' claim must fail for lack of a precise description of the easement. There was no dispute at trial as to the location of the lateral over which the Fyfes asserted a prescriptive right. In fact, the parties agreed that the lateral had been in existence for many years. Further, each party submitted its own depiction of the area into evidence and each party's exhibit showed the lateral in the same location. A photograph submitted in evidence shows that headgate 39 is identifiable as such on the Minatare Mutual canal. Upon review of the record, it is clear that the disputed lateral is the only lateral on the Baker property which runs in a general southeastwardly direction until it reaches the Fyfe property.

We find the Nebraska Supreme Court's decision in *Fischer v. Grinsbergs*, 198 Neb. 329, 252 N.W.2d 619 (1977), to be instructive in this case. In *Fischer*, the Supreme Court reversed the district court's finding that the plaintiffs had not sufficiently described a prescriptive easement over a driveway. In reaching that conclusion, the court acknowledged that a claim for an easement could not be "too indefinite for a determinate description." *Id.* at 343, 252 N.W.2d at 627. However, the court concluded that the evidence presented at trial, which included the deeds of the lots in question, undisputed testimony that the driveway extended 6 feet on the defendants' land and 3 feet on the plaintiff's land, and photographs showing the location of the driveway, was sufficient to describe the easement. In so deciding, the court emphasized that the driveway had existed for years and that the easement would be limited to the width of the driveway as was reasonably necessary for access to the plaintiff's garage. *Id.*

As did the Supreme Court in *Fischer*, we acknowledge the requirement that a prescriptive easement must have a

determinate description. Based on the evidence in this case, we conclude this requirement was met. Evidence to describe the easement over the lateral consisted of maps of the area, photographs of the lateral and headgate in question, the deeds to both the Fyfe property and the Baker property, and similar testimony from both parties regarding the location and course of the lateral. This evidence was sufficient for the court to enter judgment in favor of the Fyfes.

[14] Finally, the evidence at trial supported the scope of the easement granted. The Fyfes' documentary evidence and testimony at trial, which the district court accepted over the Bakers' conflicting testimony, demonstrated that an area 20 feet to each side of the lateral's centerline was necessary to bring in the appropriate equipment to properly clean the lateral. See *Homestead Estates Homeowners Assn. v. Jones*, 278 Neb. 149, 768 N.W.2d 436 (2009) (easement carries with it, by implication, right of doing whatever is reasonably necessary for full enjoyment of easement itself). We find no error in that determination.

## 2. REMOVAL OF CULVERTS

The district court concluded that the evidence at trial established that the Bakers' culverts on the lateral impaired the Fyfes' ability to bring water to their property and ordered the culverts to be removed. The Bakers contend that this order to remove the culverts was beyond the scope of injunctive relief. We conclude the injunctive relief was appropriate.

[15-17] The order compelling the Bakers to remove the culverts is a mandatory injunction. A mandatory injunction is an equitable remedy that commands the subject of the order to perform an affirmative act to undo a wrongful act or injury. *Bock v. Dalbey*, 283 Neb. 994, 815 N.W.2d 530 (2012). Further, an injunction, in general, is an extraordinary remedy that a court should ordinarily not grant except in a clear case where there is actual and substantial injury. *Id*. And a court should not grant an injunction unless the right is clear, the damage is irreparable, and the remedy at law is inadequate to prevent a failure of justice. *Id*.

[18,19] Where an injury committed by one against another is continuous or is being constantly repeated, so that complainant's remedy at law requires the bringing of successive actions, that remedy is inadequate and the injury will be prevented by injunction. *Lambert v. Holmberg*, 271 Neb. 443, 712 N.W.2d 268 (2006). In such cases, equity looks to the nature of the injury inflicted, together with the fact of its constant repetition, or continuation, rather than to the magnitude of the damage inflicted, as the ground of affording relief. *Id*. An adequate remedy at law means a remedy which is plain and complete and as practical and efficient to the ends of justice and its prompt administration as the remedy in equity. *Id*.

The Fyfes presented evidence at trial to show that the culverts unreasonably restricted the flow of water through the lateral. Alan Fyfe, who holds a professional engineer's license, testified that the cross section of the lateral is much larger than the cross section of the culverts, causing a weak link in the lateral system. Wingenbach, Fyfes' lessee, also testified that the culverts restricted the amount of water he received. The Fyfes also presented evidence that silt had settled into the culverts, further restricting the flow of water. The Bakers countered the Fyfes' claims with their own testimony. The Bakers' testimony demonstrated that they believed the decreased waterflow was solely the result of weeds in the portion of the lateral the Fyfes maintained.

Having considered this conflicting evidence, the district court concluded that the culverts were installed after the prescriptive period had run and that they unreasonably interfered with the flow of water in the lateral. Giving weight to the fact that the trial judge heard and observed the witnesses, we agree with this conclusion. See *Prime Home Care v. Pathways to Compassion*, 283 Neb. 77, 809 N.W.2d 751 (2012) (in appeal of equity action, where credible evidence is in conflict on material issue of fact, appellate court considers and may give weight to fact that trial judge heard and observed witnesses and accepted one version rather than another). This assigned error is without merit.

### 3. Billie Fyfe's Statements

The Bakers also contend that the district court erred when it did not allow Thomas Baker to testify regarding Billie Fyfe's response to the Bakers' decision to install culverts in place of the cement check. Thomas Baker attempted to testify to the substance of a discussion he allegedly had with Billie Fyfe. The discussion centered on how to replace the old cement check that had been damaged:

> [Bakers' counsel:] Did that discussion talk about installing the culverts that are there?
>
> [Thomas Baker:] Yes.
>
> [Bakers' counsel:] And did . . . Billie Fyfe agree or tell you he thought that would be a good idea to install some culverts in there?
>
> [Fyfes' counsel]: Objection, hearsay.
>
> [Bakers' counsel]: Party opponent, Your Honor.
>
> THE COURT: He's deceased, isn't he?
>
> [Bakers' counsel]: Well, it's his estate still involved in the case.
>
> THE COURT: I'm not sure, I think it's the [personal representative who] can waive that so I'm going to sustain that.
>
> [Bakers' counsel]: Okay. Well, it goes to his state of mind as to why he put it in as well, Your Honor.
>
> THE COURT: Okay. But I'm still — my ruling stands. Let's just move on.

The Bakers argue that Thomas Baker should have been allowed to answer the question because Billie Fyfe's estate remained a party in the litigation. Therefore, the Bakers contend that Billie Fyfe's statements were those of a party opponent and not hearsay. See, Neb. Rev. Stat. § 27-801(4)(b) (Reissue 2008); *In re Estate of Krueger*, 235 Neb. 518, 455 N.W.2d 809 (1990) (in action against estate, statement made by decedent constitutes party admission). They assert that the exclusion of this answer was prejudicial error and led the court to improperly order the removal of the culverts.

[20,21] The Fyfes contend that the Bakers have waived this argument, because no offer of proof was made at trial

to establish what Thomas Baker's answer would have been had he been allowed to answer the question. Neb. Rev. Stat. § 27-103 (Reissue 2008) provides that error may not be predicated upon a ruling admitting or excluding evidence unless a substantial right of the party is affected and, in cases where the ruling is one excluding evidence, the substance of the evidence was made known to the judge by offer or was apparent from the context within which questions were asked. The Nebraska Supreme Court has stated that in order to predicate error upon a ruling of the court refusing to permit a witness to testify, or to answer a specific question, the record must show an offer to prove the facts sought to be elicited. *Sturzenegger v. Father Flanagan's Boys' Home*, 276 Neb. 327, 754 N.W.2d 406 (2008).

Although we may be able to conclude from the context of the question asked that Thomas Baker's answer would have been that Billie Fyfe consented to the installation of culverts, that answer alone does not entitle the Bakers to relief. The problem with the culverts, as adduced by the Fyfes, was the size and maintenance of the culverts, which impeded the water flowing to their property. Thus, Billie Fyfe's purported agreement to the installation of the culverts does not end the inquiry. The pertinent questions would be whether he was informed of or involved in the details regarding the design, installation, and maintenance of the culverts. Because there was no offer of proof made, there is no evidence in the record to establish that Billie Fyfe specifically approved of the design, size, or maintenance of the culverts. We cannot say the district court's decision to sustain the Fyfes' hearsay objection constituted prejudicial error.

### 4. Jury Instruction

In their final assignment of error, the Bakers contend that the district court erroneously instructed the jury. Specifically, the Bakers take issue with the following jury instruction:

### II. Court's Findings

In an earlier proceeding the Court determined as a matter of law that [the Fyfes] owned an easement

to convey irrigation water from the [Minatare Mutual] canal across [the Bakers'] land to [the Fyfes'] land; and that this easement followed a well defined irrigation lateral across [the Bakers'] land that had been in existence for more than fifty years. The Court further determined as a matter of law that the width of the easement was 10 feet on either side of the centerline of the irrigation lateral from the [Minatare Mutual] canal eastward to the "elbow", and 20 feet on either side of the irrigation lateral centerline from the "elbow" on to [the Fyfes'] land. The Court further found that in 2007 [the Bakers] installed culverts in the irrigation lateral a short distance southeast of the "elbow" which, in part, unreasonably interfered with [the Fyfes'] easement to use the irrigation lateral. The Court ordered Baker to remove the culverts and restore the irrigation lateral to its prior condition. The Court further determined as a matter of law that [the Fyfes] had the right to access [the Bakers'] land as was reasonably necessary to maintain and repair the irrigation lateral.

The Bakers objected at the jury trial when the Fyfes offered a portion of the prior ruling into evidence, which included a statement similar to the instruction above, and the Bakers also objected to the above instruction during the instruction conference. The Bakers contend that the issue of whether they had interfered with the Fyfes' easement was a matter that should have been submitted to the jury.

[22] We reject the Bakers' arguments. As noted in the factual background above, the district court bifurcated the equitable and legal issues. An adjudication of rights with respect to an easement is an equitable action. See *Homestead Estates Homeowners Assn. v. Jones*, 278 Neb. 149, 768 N.W.2d 436 (2009). Thus, we conclude the district court properly considered the issue of interference with the easement as an equitable issue.

Further, after the district court decided the Fyfes' claim of interference with the easement as an equitable issue, it did not err when it informed the jury of this finding. Contrary to the

Bakers' assertions that this instruction left the jury with nothing to decide, the jury was required to determine what damages, if any, were proximately caused by the interference with the Fyfes' easement. After deliberation, the jury concluded that the Fyfes had established their damages in the amount of $19,200. We find no merit to this assigned error.

## V. CONCLUSION

The district court did not err when it granted the prescriptive easement or when it ordered the culverts to be removed. Further, we conclude there was no prejudicial error committed when the court sustained the Fyfes' hearsay objection, and we do not find error with the jury instructions.

AFFIRMED.

(*See page 730 for appendix A.*)



APPENDIX A
(Directional information supplied.)